**BLACKHAWK HEATING & PLUMBING CO., INC., Counterclaimant,**

v.

**SEABOARD SURETY COMPANY, Counterclaim Defendant.**

**No. 70 C 497.**

United States District Court,
N. D. Illinois, E. D.

Feb. 18, 1982.

Richard J. Brennan, James R. Vogler, Winston & Strawn, Chicago, Ill., for counterclaimant.

John L. Conlon, John L. Rogers, III, Hopkins & Sutter, Chicago, Ill., for counterclaim defendant.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge.

This is an action by Blackhawk Heating & Plumbing Co., Inc., a general contractor ("Blackhawk"), to recover $2,870,000 against Seaboard Surety Company ("Seaboard") under a performance bond issued by Seaboard covering work to be performed by a subcontractor, Power Engineering Company, Inc. ("Power").[1] There is diversity of citizenship and this court has subject matter jurisdiction.

On August 6, 1965 Blackhawk had entered into a written contract ("Prime Contract") with United States General Services Administration ("GSA"). Under the Prime Contract Blackhawk was to perform certain air-conditioning and remodeling work at a GSA building in Chicago (the "Project"). The original amount of the Prime Contract was $4,983,000. It was understood that Blackhawk would employ numerous subcontractors to perform work at the Project. Under the Prime Contract Blackhawk was responsible for scheduling the work for itself and its subcontractors so that the Project was completed on time.

On October 6, 1965 Blackhawk entered into a subcontract ("Subcontract") with Power. Under the Subcontract, for the total sum of $787,000, Power was to perform all of the electrical work called for in the GSA's plans and specifications for the Project. Power was also to furnish and supply certain material and equipment, including, among other things, a combination light fixture air diffuser unit that was referred to in the lighting fixture specifications as a Type A electrical fixture ("Type A Fixture"). There were some 8,000 Type A Fixtures to be installed on the Project. The acquisition and installation of the Type A Fixtures represented approximately $200,000 of the Subcontract's price. The Subcontract required Power to perform its obligations in strict accordance with the requirements of the Prime Contract.

---

1. The trial of this case was trifurcated pursuant to order of the court and the first set of issues to be tried were the affirmative defenses of Seaboard. A bench trial was held and post-trial memoranda and proposed findings of fact and conclusions of law have been filed by the parties. The facts are largely undisputed and the findings proposed by each party are substantially similar. Record references are set forth in the parties' proposed findings.

Power was required to provide a performance bond in an amount equal to the amount of the Subcontract. On October 22, 1965 Power applied to Seaboard for the required performance bond. Under the terms of this application (Seaboard Ex. 62), Power agreed to furnish Seaboard with such information as Seaboard may request from time to time concerning the contract covered by the bond and the work thereunder. Power further agreed that Seaboard had the right to examine its books and records.

On October 22, 1965 Seaboard as "Surety" issued a performance bond in favor of Blackhawk as "Owner." The bond provided, *inter alia*, that

The Surety hereby waived notice of any alteration or extension of time made by the Owner.

Whenever [Power] shall be, and declared by Owner to be in default under the [Sub]Contract, the Owner having performed [its] obligations thereunder, the Surety may promptly remedy the default, or shall promptly

1) Complete the [Sub]Contract in accordance with its terms and conditions, or

2) Obtain a bid or bids for submission to Owner for completing the [Sub]Contract in accordance with its terms and conditions, and upon determination by Owner and Surety of the lowest responsible bidder, arrange for a contract between such bidder and Owner, and make available as work progresses (even though there should be a default or a succession of defaults under the contract or contracts of completion arranged under this paragraph) sufficient funds to pay the cost of completion less the balance of the contract price; but not exceeding, including other costs and damages for which Surety may be liable hereunder, the amount set forth in the first paragraph hereof. The term "balance of the contract price," as used in this paragraph, shall mean the total amount payable by Owner to [Sub]Contractor under the [Sub]Contract and any amendments thereto, less the amount properly paid by Owner to [Sub]Contractor.

(Seaboard Ex. 63).

Neither the performance bond, nor the application therefor, expressly provided that Seaboard was entitled to any notice from Blackhawk of Power's progress under the Subcontract or notice of Power's default.

During the course of the Project four major delays occurred which extended the Project completion date: (1) a delay by the GSA in turning over certain fan rooms to Blackhawk so that work could proceed; (2) a delay caused by the GSA relating to defective ductwork drawings; (3) a delay by Power and GSA in the furnishing of an acceptable lens for the Type A Fixture; and (4) a delay by Power in the supplying of an acceptable air diffuser boot for the Type A Fixture. The delays caused by GSA overlapped with the delays related to the Type A Fixture.

During the period that Blackhawk was attempting to obtain adequate revised ductwork drawings, there was considerable correspondence between Blackhawk and GSA as to the need for the revisions and the information necessary for the revisions to be made. One of the positions taken by the GSA was that it was unable to provide revised ductwork drawings without an approved Type A Fixture. Blackhawk rejected this argument and was of the opinion that an approved fixture was not needed to revise the ductwork drawings. Mr. Machata, Blackhawk's President, described the GSA's position as "a felonious defense" that gave him "no problem."

Blackhawk was of the opinion that GSA's failure to provide revised ductwork drawings was delaying the overall progress of the work on the Project and that approval of a Type A Fixture was not necessary for the drawings to be revised. However, Blackhawk also wrote a number of letters to Power in 1966 in which it claimed that Power's failure to obtain approval of the Type A Fixture was delaying overall job progress on the Project. For instance, on September 14, 1966 Blackhawk's superintendent on the Project wrote to Power:

On 26 August 1966, approval was refused for the use of the combination light fixture and air diffuser, submitted by you for use on this project. This disapproval was based upon your submittal of air data and built-in air volume control and flow pattern control, which does not meet with the requirements of the Contract Specifications.

There has been no indication of any real effort on your part to resubmit this material as required by the Specifications, in order to obtain the approval for the fixtures and air terminals you propose to use.

Your continued failure to submit a fixture as required is continuing to delay the progress of this project. Any result in assessment of liquidated damages, due to your actions, you will be held wholly accountable for. Please submit required material in approved form as quickly as possible. (Seaboard Ex. 27).

Despite these formal protests, it was clear to the court that Blackhawk was only making a paper record. On January 3, 1967 Machata wrote to Ray Murphy, president of Power, concerning the Type A Fixture:

Enclosed please find letters from the General Services Administration dated December 19, 1966 and December 21, 1966, in regard to the above-noted fixtures. As you know, many Government-caused delays have obstructed progress on this job to date, and we feel we can establish such delays, and Governmental responsibility therefore, without too much difficulty.

It could certainly hurt our position, however, if the fixture has not been approved prior to the resolution by the Government of the design problems which are now hindering our progress. We have been informed that the Government is coming out with new ductwork drawings in the immediate future. *Thus, while there has been no hurry to have the fixture approved in the past in the light of Governmental delays*, we must gain such approval in the near future.

I do not know how involved you have become in this problem, but I'm sure you can see the critical nature of this approval and I trust it will receive your attention. (Seaboard Ex. 44; emphasis added).

It was Blackhawk's opinion that the work on the Project had been delayed during the relevant period in 1966–67 principally because of the GSA's failure to provide the revised ductwork drawings and that Power's failure to obtain approval of the Type A Fixture was not the principal cause of the delay.

At no time during the period 1965–67 did Blackhawk inform Seaboard that Power was encountering problems in getting approval for the Type A Fixture or that it was delaying progress of the work on the project in any respect. It is Seaboard's practice when notified of problems on a job to respond and take whatever steps are necessary to resolve them.

On April 24, 1967 Blackhawk submitted a request to the GSA for a 415-day time extension on the Project based upon the GSA's delays in providing the revised ductwork drawings. The time extension covered the period during which Power had failed to obtain approval for a Type A Fixture, and if Blackhawk's time request had been granted, there would have been no claim against Power.

The GSA[1] Contracting Officer denied the bulk of Blackhawk's time extension request, finding that certain dimensional data for the Type A Fixture was required before the revised ductwork drawings could be furnished by the GSA. Blackhawk appealed the Contracting Officer's decision to the General Services Board of Contract Appeals. During extensive hearings before the Board, Blackhawk presented, along with its claim relating to the ductwork, Power's claim that the Type A Fixture lens and air diffuser boot were not commercially available according to specifications of the Prime Contract.

Seven years later, four years after this case commenced, the Board found in favor of Power's position on the Type A Fixture lens, and awarded a time extension of 184

days. The Board rejected Power's position on the commercial availability of the Type A Fixture air diffuser boot, finding that Power's failure to supply the boot delayed the job 391 days, and that the boot delay overshadowed the GSA delays relating to the ductwork drawings.

Other than its problems in getting approval of the Type A Fixture and initiating deliveries of the fixture to the Project, Power was properly performing its electrical work called for under its Subcontract. Power continuously worked on the Project from about December, 1965 until June 16, 1969, and was working throughout the period of delays relating to the Type A Fixture. Power supplied laborers and materials for electrical work, including the installation of switchboards, transformers and refrigeration equipment. At no time until June 16, 1969 did Power cease performance of its Subcontract.

Beginning in August of 1967, Seaboard received information that the estimated completion date of the Project was being delayed. For example, Power's Treasurer reported to Seaboard that the Subcontract was 70% complete and would probably be completed in August, 1968. A Seaboard General Form Status Inquiry dated October 4, 1968 reported that the approximate percentage or dollar amount of the Subcontract completed or delivered was 65%, and that the probable completion date was March 1, 1969. Seaboard did nothing in response to receiving these reports even though it had a clear right to conduct further inquiry of Power. However, in construction work delays in completion dates are commonplace and provide no special notice of any performance failure.

In March, 1969 Thomas Starr, a managing attorney for Seaboard who handled construction bond problems for it, was advised by Power that it was encountering serious financial difficulties.[2] Starr also received a copy of a letter from Power to Blackhawk

which gave notice to Seaboard that Blackhawk had threatened to default Power as a result of delays in Power's work. Blackhawk Ex. 87. Thus, as of March, 1969, Seaboard had sufficient notice of a possible delay claim by Blackhawk to cause Seaboard to inquire of Power.

In March, 1969 Starr had an examination made of Power's financial records by one of Seaboard's accountants and held a number of meetings between representatives of Seaboard, Power and others who might be interested in an arrangement involving the completion of Power's contracts. By June, 1969 it was decided that Power had no alternative but to acknowledge its inability to complete its pending construction contracts, including the Subcontract.

Power acknowledged default in June, 1969. At this point quite a bit of Power's work remained to be completed on the Project and Seaboard had four alternatives with respect to its performance bond:

(a) contract directly with an electrical contractor who would undertake to complete Power's work on the Project;

(b) obtain bids from electrical contractors for the completion of Power's work, tender the lowest responsible bidder to Blackhawk and pay the cost for this contractor's completion over the unpaid balance remaining under Power's subcontract;

(c) tender the amount of its bond to Blackhawk; or

(d) do nothing and await suit by Blackhawk for its damages in having to complete Power's work (the excess of what it cost for it to get Power's work completed over the unpaid balance on Power's subcontract).

At the time of Power's acknowledgment of default there was a balance payable to Power on the Subcontract. Seaboard believed that this amount was approximately $100,000. Seaboard decided to propose to Blackhawk that Seaboard would contract

**2.** Although Starr had first learned that Power had some financial problems in March, 1968 when he was advised that its bank had made an offset against Power's funds, he believed

that those problems had been overcome by the acquisition of some new capital from a group of investors.

with an electrical contractor to complete Power's work in exchange for Blackhawk's agreement to pay to Seaboard all sums then owing to Power.

On June 19, 1969 representatives of Seaboard and Blackhawk met and executed a take-over agreement covering Power's work on the Project. Starr was present for Seaboard and Machata and one other person represented Blackhawk. The take-over agreement provided in part as follows:

> Seaboard Surety Company, in accordance with its obligations under the subject bond, has effected arrangements to continue the prosecution of the work under the subject contract in accordance with all of the terms, conditions and provisions thereof and the plans, drawings and specifications relating thereto, subject, of course, to your agreement to make payment to Seaboard Surety Company ... of all sums now due or hereafter becoming due, including all retainage now accrued or hereafter accruing, under or in connection with said contract as the same heretofore may have been or hereafter may be validly amended, modified or changed. Seaboard Surety Company will hold you harmless from and indemnify you against any claim or claims which may be asserted by any other party or parties claiming a superior right to said sums. (Seaboard Ex. 65)

The meeting in Washington lasted approximately 20 minutes. At no time during that meeting was Starr advised that Blackhawk had any delay claims against Power or that Blackhawk would withhold any money payable under Power's subcontract for any reason.

Starr testified that had he been told at the time the take-over agreement was signed that Blackhawk had delay claims against Power, he would not have proceeded with the execution of the take-over agreement because an essential part of the take-over agreement from Seaboard's point of view was Blackhawk's agreement to pay Seaboard the sums then due Power. The court accepts this testimony. It is reasonable to conclude from all of the testimony

that Starr would have behaved differently had the specter of a delay claim been raised at this brief meeting in Washington.

After executing the take-over agreement, Seaboard promptly arranged for the resumption of deliveries of materials to the Project by two suppliers by guaranteeing them that they would be paid for those deliveries and arranged with L. K. Comstock & Co. of Illinois to complete Power's work on the Project. By February, 1970 Comstock had furnished all of the material and performed all of the electrical work required by Power's Subcontract.

In August, 1969 Seaboard submitted a request for a partial payment for work performed on the Project. It reiterated that request in a letter dated September 11, 1969. By letter dated September 15, 1969 Blackhawk responded that Seaboard's calculation of the progress payment was incorrect and that the amount due was $10,312.60. A check for that amount was enclosed with Blackhawk's letter. On October 16, 1969 Blackhawk, in response to a request from Seaboard, provided a statement of how it had calculated the value of the work performed on the Project as of September.

On December 24, 1969 Blackhawk sent a letter to Starr in which Blackhawk, for the first time, raised its claim for delay. The letter, in relevant part, stated:

> Unfortunately it becomes our obligation *to raise at this time* for your review, investigation, evaluation and subsequent response, certain areas of financial loss that have been occasioned by the delinquent and untimely performance of your principal, Power Engineering Company. Based upon our management's review of these circumstances in the light of contract balances presently claimed, it has been determined that prior to the payment of subsequent payments we should be furnished with your acknowledgment of these factors and a statement of your position with respect to same. (Seaboard Ex. 72; emphasis added)

Blackhawk then went on to claim that there had been a 370-day delay on the Project

that was "solely attributable to the delinquent performance" of Power in obtaining approval of the Type A Fixture and a delay of an additional 176 days as a consequence of Power's failure to timely deliver the Type A Fixture until August 15, 1967.

The relevant facts can be briefly summarized. A surety has issued a performance bond guaranteeing a subcontractor's work. The bond does not require that the contractor give notice of the subcontractor's default. The contractor experiences delays on the construction project due to the failure of a subcontractor to provide fixtures which meet specifications and also due to the failure of the owner to provide certain things. The contractor asserts a possible claim for delay against both the subcontractor and the owner, but he pursues only the claim against the owner. Although the acts of the subcontractor could be found to be the sole cause of the delay of the project, and the delay could result in substantial additional cost in completing the project, the general contractor continues to work with the subcontractor for 15 months and never notifies the subcontractor's surety of the delay caused by the subcontractor and of the possibility of a substantial claim against the surety. At the end of the 15-month period, the contractor asserts a claim against the surety for the additional costs incurred in completing the project. The claim is approximately 3.5 times the amount of the subcontract guaranteed by the surety.

On these facts, Seaboard denies liability, claiming that an implied condition of the performance bond for the recovery of additional costs due to the subcontractor's delays was that the general contractor would notify Seaboard of any delays and give Seaboard the opportunity to remedy those delays, and that failure to give the notice bars *any* recovery by Blackhawk. Seaboard also argues for the same result under principles of estoppel and laches.

■ The court agrees in part with Seaboard's position. To the extent that Seaboard could have remedied the delays, and thereby avoided the additional costs, if it

had been given an opportunity to do so, Seaboard is not liable to Blackhawk for such delays. However, to the extent that notice would have been futile, that is if given notice Seaboard could not have remedied the delays, then the failure to give notice is immaterial and Seaboard is liable to Blackhawk for any delays which could not have been avoided by Seaboard.

This appears to be the law of Illinois which, of course, governs this case under *Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In *Taussig v. Reid*, 145 Ill. 488, 494–95, 30 N.E. 1032 (1893), the Illinois Supreme Court stated:

We think that the decided weight of authority establishes the rule, that in case of a collateral continuing guaranty, like the one in question, reasonable notice of the default of payment on the part of the principal debtor should be given to the guarantor. And the guarantor will be discharged from payment, so far as he has sustained loss or damage, resulting from a failure of the creditor to give him such notice. Tiedeman on Com. Paper, 421. Cases may arise where notice would result in no benefit whatever to the guarantor; for example, where the principal debtor was insolvent when the guaranty was executed and remained in that condition. In such cases the failure to give notice could result in no loss to the guarantor, and could not be relied upon as a defense to an action on the guaranty. But where the guarantor may be able to protect himself, notice of default in payment imposes no unreasonable hardship on the creditor, and every principle of commercial usage requires that it should be given.

In two cases language substantially identical to that in Seaboard's performance bond was held to create a condition of notice to the surety in order to hold the surety liable for additional costs incurred as a result of a subcontract's delay. *Bayer & Mingolla Construction Co. v. Deschenes*, 348 Mass. 594, 205 N.E.2d 208 (1965); *Plowden & Roberts, Inc. v. Conway*, 192 So.2d 528 (Fla.App.1966).

In *Bayer*, Aetna Insurance Co. had given a bond for a subcontractor on a highway project which provided in "Condition (2)" that, upon receipt of written notice from the general contractor that the subcontractor was in default, Aetna would have the right within 30 days after receipt of such notice to remedy the default or to proceed, or procure others to proceed, with the performance of such subcontract. The Supreme Judicial Court of Massachusetts in interpreting this provision stated:

Condition (2) does not expressly require Bayer [the general contractor], as obligee of the bond, to give notice of Deschenes' [the subcontractor's] default. It does, however, imply that Bayer was bound to give such notice within a reasonable time . . . so that Aetna might have opportunity to decide whether it would complete Deschenes' work as a method of minimizing its own loss. (205 N.E.2d at 212)

The same conclusion was reached by the Florida Court of Appeals in *Plowden & Roberts, Inc. v. Conway, supra*, 192 So.2d at 533:

The performance bond given by U.S.F. & G. provides that, whenever Conway shall be and declared by Plowden to be in default under the contract, Plowden having performed its obligations thereunder, then U.S.F. & G. may promptly remedy the default or shall promptly (1) complete the contract in accordance with its terms and conditions, or (2) obtain bids for submission to Plowden for completing the contract, arrange for a contract between the bidder and Plowden, and make available sufficient funds to pay the cost of completion, less the balance of the contract price. These provisions permitting U.S.F. & G. to remedy the default by completing the contract or arranging for a contract for completion are not made conditions precedent to suit. The fact that Plowden does not allege a demand upon U.S.F. & G. to remedy the default, complete the contract or obtain a contract for completion, does not totally relieve the compensated surety from all obligations under the performance bond. The bond does not specifically so provide and

under the circumstances U.S.F. & G. must plead and prove the damages, if any, resulting from Plowden's failure to permit it to promptly remedy the alleged default in accordance with the terms of the bond. *Maule Industries, Inc. v. Gaines Construction Co., Inc.*, Fla.App. 1963, 157 So.2d 835. *The compensated surety's liability is merely reduced by any harm which it has suffered by the fact that it was not accorded its rights to remedy the default.* (Emphasis added)

Finally, in *Continental Bank & Trust Co. v. Am. Bonding Co.*, 605 F.2d 1049, 1057 n. 17 (8th Cir. 1979), the Court stated:

In the absence of a provision in the bond agreements requiring notice to the surety upon the principal's default, the surety is not discharged by the obligees' failure to communicate such notice. RESTATEMENT OF SECURITY § 136 (1941). Nevertheless, the obligee may not delay before notifying the surety and then insist that the measure of the surety's liability includes escalated costs arising in the interim between default and demand.

The cases relied upon by Blackhawk, which state the general rule that absent some contractual or statutory duty a surety is not entitled to notice of the principal's default, tend to support the further proposition that if the failure to give notice results in increased damages which could have been avoided if the surety had been notified, then the failure to give the notice bars recovery of the increase in damages. In each of *Conesco Industries, Limited v. Conforti and Eisele*, 627 F.2d 312, 316 (D.C.Cir. 1980); *New Amsterdam Cas. Co. v. U. S. Shipping Bd. Emergency Fleet Corp.*, 16 F.2d 847 (4th Cir. 1927); and *Robertson Lumber Co. v. Progressive Contractors, Inc.*, 160 N.W.2d 61 (N.D.1968), the courts held that a surety was not discharged by the obligee's failure to give either notice or the number of notices required *because the surety was not damaged by the absence of notice.*

The next question is how much of the additional costs could have been avoided by Seaboard if Blackhawk had given Seaboard notice and an opportunity to remedy the default. Supplemental memoranda on this issue were requested by the court since the evidence presented at the trifurcated hearing did not specifically deal with the issue.[3] Seaboard's argument is that the finding of the General Services Board of Contract Appeals ("GSBCA") that the Type A Fixture air diffuser boot was commercially available in August of 1966 is binding on Blackhawk, and that it follows that since the boot was commercially available in August of 1966, Seaboard could have acquired the Type A Fixture and avoided the delays.

Blackhawk responds by arguing that the issue of whether Seaboard could have avoided certain delays is fundamentally different from the issues decided by the GSBCA and it is not collaterally estopped on issues decided by the GSBCA. Blackhawk further argues that the cause and magnitude of the delays experienced in the completion of the Project had been reserved for a later phase of this litigation, and that the related issue of what damages could have been avoided by Seaboard if it had been given the opportunity to do so properly should be deferred until the parties have had an adequate amount of time to prepare for a hearing on the issue.

■ The court is persuaded that Blackhawk is collaterally estopped to relitigate the factual issues decided by the GSBCA. The federal courts have held collateral estoppel applicable to an administrative agency's determination of a factual issue when the agency's decision was made in a judicial (as opposed to a rule making) capacity and the parties had an adequate opportunity to litigate the issue. *United States v. Utah Construction Co.*, 384 U.S. 394, 421–22, 86 S.Ct. 1545, 1559–1560, 16 L.Ed.2d 642 (1966); *Retail Clerks Union v. N. L. R. B.*, 463 F.2d 316, 322 (D.C.Cir.1972).

The Illinois courts apparently have not ruled on the question of whether collateral estoppel can be applied to an administrative decision. The Seventh Circuit was faced with predicting whether Indiana courts would apply collateral estoppel to an administrative determination in *Bowen v. United States*, 570 F.2d 1311 (7th Cir. 1978). It concluded that Indiana would follow the overwhelming trend of authority to give collateral estoppel effect to an administrative determination. *Id.* at 1320–23. There is no reason to believe that Illinois would not similarly follow the trend of authority.

Under both federal and Illinois law, collateral estoppel would be applicable even though Seaboard was not a party to the GSA proceeding. *Blonder-Tongue v. University of Illinois Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971); *Butler v. Stover Bros. Trucking Co.*, 546 F.2d 544, 550–51 (7th Cir. 1977); *Garcy Corp. v. Home Insurance Co.*, 496 F.2d 479, 483 (7th Cir. 1974), *cert. denied* 419 U.S. 843, 95 S.Ct. 75, 42 L.Ed.2d 71; *Federal Savings and Loan Insurance Corporation v. Hogan*, 476 F.2d 1182, 1187 (7th Cir. 1973); *Tezak v. Cooper*, 24 Ill.App.2d 356, 363, 164 N.E.2d 493 (1st Dist. 1960).

However, the significance of GSBCA's findings cannot be decided on the present record. Moreover, there are other delays claimed by Blackhawk which were not related to the air diffuser boot and no evidence was presented at the hearing concerning the causes and possible cures of these delays. Blackhawk is entitled to a further hearing on the issue of what damages could have been avoided had Seaboard been given notice. At the hearing, Blackhawk shall be estopped from relitigating the factual issues actually found by the GSBCA and Seaboard shall have the burden of proving that it has been prejudiced, that

---

**3.** At the hearing Seaboard argued for a total bar on recovery of any damages because of Blackhawk's failure to give notice based on theories of laches, estoppel, and Blackhawk's "failure to give proper consideration to Seaboard's position as Power's performance bond surety." In contrast, at the hearing Blackhawk argued that it was entitled to all of its damages since it had no duty to give notice to Seaboard and it was not barred from recovering its damages by laches, estoppel or any other legal doctrine.

is damaged by Seaboard's failure to give notice of Power's delays. Hopefully, little or no further discovery shall be necessary. The court will give priority to this hearing in view of the age of the case.

 The other affirmative defense raised by Seaboard is rejected by the court. Seaboard argues that Blackhawk is estopped from making its delay claim for damages by its having entered into the take-over agreement with Seaboard to pay Seaboard the unpaid balance on Power's subcontract for the completion of Power's work. The court has found that at the Washington meeting at which the take-over agreement was executed, Seaboard's representative was not told about Blackhawk's claim for delay damages against Power and that if he had been told about the delay claim he would not have executed the take-over agreement. Nevertheless, the court rejects Seaboard's estoppel argument.

The essence of Seaboard's argument is that by entering into the take-over agreement it gave up certain alternatives it had under the performance bond relating to work on the Project that remained to be done. Seaboard claims that upon Power's default in June of 1969, instead of arranging for the completion of Power's work, it could have tendered a contractor to Blackhawk for Blackhawk to contract with and pay, or refused to do anything and await a damage suit. These alternatives, however, have absolutely nothing to do with Blackhawk's claim for damages which had already occurred. They merely relate to conduct of the parties *after* June of 1969.

While it is likely that Seaboard would have pursued one of its other alternatives if at the time of the Washington meeting it had been told that Blackhawk had a substantial delay claim which it was going to assert against Seaboard, Seaboard would still have been liable under its performance bond with respect to the completion of the Project. That liability would not have disappeared. So one of the alternatives would have to have been pursued, even if it was "do nothing and wait to be sued." The selection of one or another of the alternatives available to Seaboard as a result of the June 1969 default could not have affected the relative position of the parties with respect to the pre-March, 1969 delays.

ORDER

Accordingly, the court finds in favor of Seaboard on one of its affirmative defenses. This case shall be set for further hearing on the issue of whether Seaboard has been damaged by Blackhawk's failure to give notice of Power's delays. The parties are requested to prepare for such hearing and to contact the court's minute clerk for the purpose of scheduling the hearing.