167 P.3d 1125 (2007)
COLORADO STRUCTURES, INC., a Colorado corporation, licensed to do business in Washington d/b/a CSI Construction Company, Respondent,
v.
INSURANCE COMPANY OF THE WEST, a California corporation; Star Insurance Company, a Michigan corporation; Action Excavating and Paving, Inc., an inactive Oregon corporation; and Marlowe Heinz, personally, Petitioners.
No. 76973-7.
Supreme Court of Washington, En Banc.
Argued May 23, 2006.
Decided September 20, 2007.
*1127 Joseph C. Calmes, Magnus Rune Andersson, Hanson Baker Ludlow Drumheller PS, Bellevue, WA, for Petitioners.
Jeffrey Kenneth Hanson, Yazbeck Cloran & Hanson LLC, Portland, OR, Nell Anne Oram, Attorney at Law, Tigard, OR, Joseph A Yazbeck Jr., Attorney at Law, Portland, OR, for Respondent.
Jerret E. Sale, Deborah Lynn Carstens, Bullivant Houser Bailey PC, Seattle, WA, Amicus Curiae on behalf of The Surety Association of America.
CHAMBERS, J.
¶ 1 Colorado Structures, Inc. (Structures) contracted with Wal-Mart to build a store in Vancouver, Washington. Structures subcontracted[1] with Action Excavating and Paving, Inc. (Action) to help build the sewer system for the Wal-Mart store. Insurance Company of the West, Inc. (West), acting as a surety, issued both a payment bond and a performance bond,[2] the latter guaranteeing Action's sewer work. Unfortunately, Action failed to perform satisfactorily and breached the subcontract. As a result of the breach, Structures asked West to pay as provided by the performance bond. West refused on the ground that Structures did not formally declare *1128 Action in default before Action had substantially completed the sewer work. This suit followed.
¶ 2 We affirm the decision of the Court of Appeals that Structures was not required to formally declare Action in default before West's liability on the performance bond was triggered. We also affirm the Court of Appeals' holding that Olympic S.S. Co. v. Centennial Ins. Co., 117 Wash.2d 37, 811 P.2d 673 (1991), applies to surety bonds and to this case.

FACTS
¶ 3 Wal-Mart planned a grand opening of its store on October 14, 1998, and Structures agreed to finish construction by September 8, 1998. Under the contract, Structures faced enormous financial penalties if the construction work was not completed in time for this grand opening. Action was hired for the offsite sewer work. Because this work was substantial, Structures required Action to secure a performance bond in the amount of the contract. West issued the bond in the penal amount of $472,290 for a premium of $8,034, with West as the surety, Action as the principal, and Structures the obligee. The bond West issued was the American Institute of Architects' Form A311, which has been in use since 1958 and is one of the most commonly used performance bonds. Edward H. Cushman, Surety Bonds on Public and Private Construction Projects, 46 A.B.A.J. 649, 651 (1960).
¶ 4 Under the subcontract, Action was to begin the sewer work in May 1998 and finish in July 1998. By the end of June, Action was, in the opinion of Structures, "seriously behind schedule." Ex. 9. Structures granted several extensions to Action but required that Action's work be fully completed before September 1, 1998. It was critical to complete the sewer system by September 1, 1998, because it was necessary to test and hook up the sewer before an occupancy permit could be issued for the Wal-Mart store. Despite the extensions, Action continued to face difficulties in completing its work. On August 11, 1998, Structures informed West in writing that it was a "little concerned with Action completing by [the] scheduled completion date." Ex. 13. On August 23, 1998, Structures and Action representatives met to discuss Action's performance. Because of its pressing deadline, Structures decided that instead of incurring the delays associated with terminating Action's subcontract and bringing in a new sewer contractor, Structures would supplement Action's crews in an effort to complete the sewer work as scheduled.[3] On August 25, 1998, Structures faxed West a letter setting forth Action's "breaches and the remedy to be employed by Structures," which included supplementing Action's crews with "additional manpower and equipment," in an effort to complete the subcontract and project as scheduled. Clerk's Papers (CP) at 526; Ex. 15. On that same day, Structures asked West's surety manager to attend an on-site meeting in an attempt to discuss Action's difficulties and Structures' supplementation of Action's crews. However, despite Structures' multiple pleas to the bonding company, West refused to send a representative to visit the site and discuss the situation.[4] West refused to participate in discussions regarding Action's performance or to comment on Structures' chosen remedy. Structures continued to supplement Action's crews to minimized cost and delay and complete the project on time.
¶ 5 Unfortunately, even with the assistance of additional crews provided by Structures, Action did not timely complete its work. On September 18, 1998, Structures notified West that the city of Vancouver had rejected some of Action's work because the sewer pipe had been installed at the wrong slope and the sewage would not flow properly. Structures also said that it would "be looking to [West] *1129 for compensation of costs which exceed Action['s] subcontract." Ex. 21.[5] Then, on October 9, 1998, Structures contacted West and told it that the cost of supplementing Action's crews exceeded the subcontract and that Structures would be asking West to pay the difference.
¶ 6 After West was first notified of Action's problems in August 1998, the record suggests that its response was limited. First, on September 15, 1998, apparently in response to a letter faxed by Structures on September 9, 1998, West opened up a monitoring file and requested a laundry list of documents from Structures, including the bond number in question. Second, on October 9, 1998, West decided that it would write no more bonds to Action. Finally, it appears that West sought and obtained a judgment against the owners of Action for an amount that included potential payment to Structures on the performance bond.[6] West explains that it did not contact Structures because it did not want to interfere with Structures' subcontract with Action.
¶ 7 Structures sued West, Action, and Action's owner. Action and its owner subsequently defaulted and went out of business. They are not a party to this suit. Structures had not formally declared Action to be in default before Action had substantially completed its work. West refused to honor its bond based upon its interpretation of the bond language. A bench trial was held in Clark County Superior Court. The trial court ruled that Action was in material breach,[7] that Structures, as a matter of law, was not required to formally declare Action in default before West was liable on the performance bond, and that Structures had given West adequate notice of Action's performance problems throughout the project. Additionally, the trial court awarded Structures reasonable attorney fees under the subcontract but denied Structures' claims for attorney fees under Olympic Steamship.[8] Further, the trial court ruled that since the bond incorporated the terms of the subcontract, the combination of damages and fees could not exceed the amount of the bond. In all, the trial court awarded Structures $472,290.[9]
¶ 8 The Court of Appeals affirmed the trial court's ruling on the performance bond on slightly different grounds,[10] holding that, by the plain language of the bond, West's liability was not conditioned on Structures declaring Action in default, and reversed the trial court's denial of Olympic Steamship attorney fees to Structures, holding that Olympic Steamship applied. The Court of Appeals directed the trial court to award Structures' attorney fees without regard to the penal amount of the bond. Colorado Structures, Inc. v. Ins. Co. of the W., 125 Wash.App. 907, 106 P.3d 815 (2005). We accepted review and affirm. Colorado Structures, Inc. v. Ins. Co. of the W., 155 Wash.2d 1021, 126 P.3d 1279 (2005).

ANALYSIS

DECLARATION OF DEFAULT
¶ 9 First we must decide whether West's obligations as a surety was conditioned upon Structures having declared a default in writing before Action, the principal, substantially completed the work. Resolution *1130 of this issue requires an interpretation of the surety contract. The undertakings of compensated sureties are regarded as "in the nature" of insurance contracts, Nat'l Bank of Wash. v. Equity Invs., 86 Wash.2d 545, 553, 546 P.2d 440 (1976) (quoting Ore-Ida Potato Prods., Inc. v. United Pac. Ins. Co., 87 Idaho 185, 199, 392 P.2d 191 (1964)), and subject to the rules "applicable to simple contract law." Nat'l Bank, 86 Wash.2d at 551, 546 P.2d 440. Interpretation of an insurance contract is a question of law, reviewed de novo. Roller v. Stonewall Ins. Co., 115 Wash.2d 679, 682, 801 P.2d 207 (1990) (overruled in part by Butzberger v. Foster, 151 Wash.2d 396, 89 P.3d 689 (2004)). We also must determine whether Olympic Steamship attorney fees may be awarded on a performance bond. A party's entitlement to attorney fees is an issue of law, also reviewed de novo. McGreevy v. Or. Mut. Ins. Co., 90 Wash.App. 283, 289, 951 P.2d 798. 90 Wash.App. 283, 951 P.2d 798 (1998).
¶ 10 We agree with the Court of Appeals that by the plain terms of the bond, the obligee was not required to formally declare the principal in default and that, regardless, adequate notice of default was given to the surety. Because we can neither improve upon nor add to the analysis of the Court Appeals, we explicitly adopt the Court of Appeals' analysis of this issue as our own. We quote the relevant portions in full:
¶ 11 The performance bond [at issue] here . . . reads as follows:
[A] Action Excavating & Paving, Inc. . . ., hereinafter called Principal, and Insurance Company of the West . . ., hereinafter called Surety, are held and firmly bound unto CSI Construction Co. . . ., hereinafter called Obligee, in the amount of . . . $472,290. . . .
[B] WHEREAS, Principal has . . . entered into a subcontract with Obligee . . ., which subcontract is by reference made a part hereof, and is hereinafter referred to as the subcontract, NOW THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH THAT, if Principal shall promptly and faithfully perform said subcontract, then this obligation shall be null and void; otherwise it shall remain in full force and effect.
[C] Whenever Principal shall be, and declared by Obligee to be in default under the subcontract, the Obligee having performed Obligee's obligations thereunder:
(1) Surety may promptly remedy the default, subject to the provisions of paragraph 3 herein, or;
(2) Obligee after reasonable notice to Surety may, or Surety upon demand of Obligee may arrange for the performance of Principal's obligation under the subcontract subject to the provisions of paragraph 3 herein;
(3) The balance of the subcontract price, as defined below, shall be credited against the reasonable cost of completing performance of the subcontract. If completed by the Obligee, and the reasonable cost exceeds the balance of the subcontract price, the Surety shall pay to the Obligee such excess, but in no event shall the aggregate liability of the Surety exceed the amount of this bond. If the Surety arranges completion or remedies the default, that portion of the balance of the subcontract price as may be required to complete the subcontract or remedy the default and to reimburse the Surety for its outlays shall be paid to the Surety at the times and in the manner as said sums would have been payable to Principal had there been no default under the subcontract. The term "balance of the subcontract price," as used in this paragraph, shall mean the total amount payable by Obligee to Principal under the subcontract and any amendments thereto, less the amounts heretofore properly paid by Obligee under the subcontract.
[D] Any suit under this bond must be instituted before the expiration of two (2) years from date on which final payment under the subcontract falls due.
[E] No right of action shall accrue on this bond to or for the use of any person or corporation other than the Obligee named herein or the heirs, executors, *1131 administrators or successors of Obligee.[3]
For ease of reference, we have inserted capital letters at the beginning of each major paragraph.
. . . .

I
The first issue is whether [West] is liable on its bond. [West] claims it is not, "because [Structures] did not declare Action in default before substantial completion of the bonded offsite contract."13 According to [West], its "liability on its bond was conditioned on a declaration of default from [Structures]," [Structures] did not make such a declaration, and thus [West] cannot now be liable.14 [Structures] responds in part that it declared Action to be in default.
A bond is a contract that governs the surety's liability to the obligee.15 It is interpreted using general principles of contract construction and performance.16 Here then we (A) review relevant contract principles, (B) examine the bond's terms, and (C) apply the results to [West]'s claim.

A
We turn first to relevant contract principles. A contract, including a bond, should be construed as a whole17 and, if reasonably possible, in a way that effectuates all of its provisions.18 If unambiguous, it should be construed in accordance with the parties' plain intent.19 If ambiguous, it should be "construed in favor of liability of the surety."20
A contract, including a bond, can contain conditions as well as promises. A condition is an event that must occur, or a circumstance that must exist, in order for the promisor to have a duty to perform.21 A promise is a "`manifestation of intention to act or refrain from acting in a specified way.'"22
A condition is classified according to its origin and effect. It can be express, implied in fact, or constructive.23 It is "precedent" if its occurrence triggers a duty of performance that had not arisen previously, but "subsequent" if its occurrence defeats a duty of performance that had arisen previously.24
When a contract provision is both a condition and a promise, the remedies available for its breach vary by whether the breach is "material." If the breach is "material," the promisee has an election: He or she may treat the breach as a failure of a condition that excuses further performance, and thus terminate the contract,25 or he or she may waive the condition and allow performance to continue.26 Regardless of whether the breach is "material," the promisee can recover damages.27 As one authority explains:
Any unjustified failure to perform when performance is due is a breach of contract which entitles the injured party to damages. If the breach is slight or insubstantial, it is called a partial breach, for which plaintiff's damages are restricted to compensation for the defective performance. If the breach is material, it is called a total breach, which gives to the injured party an election to substitute for his contractual rights the remedial right to damages for total failure of performance. He has the alternative election of treating the contract as continuing, however, in which case his damages are limited as for a partial breach.[28]

B
Having reviewed relevant contract principles, we next examine the bond. It incorporates the offsite subcontract by reference,29 so the two must be read together. Action is both the bond principal and subcontract promisor; [Structures] is both the bond obligee and subcontract promisee; and [West] is the bond surety. The bond was quoted above.
By its plain terms, Paragraph A of the bond makes [West] immediately liable to [Structures]. It states that [West] is "held and firmly bound unto [Structures] . . . in the amount of . . . $472,290."30
By its plain terms, Paragraph B conditions the liability created by Paragraph A on one  and only one  express condition *1132 subsequent. Paragraph B states that "the condition of this obligation is such that, if [the] Principal shall promptly and faithfully perform said subcontract, then this obligation shall be null and void; otherwise it shall remain in full force and effect."31 By using the word "condition" in its singular form, Paragraph B manifests that the liability created by Paragraph A is subject to only one condition-that the principal "promptly and faithfully perform" the offsite subcontract. By using the word "otherwise," which we have italicized, Paragraph B expressly eliminates all other conditions. Read together, Paragraphs A and B state that the surety's obligation commences when it executes the bond32 and continues until the principal promptly and faithfully performs.33
When Paragraph C applies, it provides for certain remedies and measures of damage.34 By its terms, however, it applies only when (1) the principal is "in default under the subcontract";35 (2) the obligee declares the principal to be in default under the subcontract; and (3) the obligee has performed its own obligations under the subcontract. It does not apply, by negative but necessary implication, under other circumstances. Under other circumstances then, one looks to the common law for remedies and measures of damage.36

C
With this background, we turn to [West]'s claim that it is not liable on the bond because [Structures] failed to declare a "default." To analyze that claim, we make several inquiries. (1) Did Action materially breach the offsite contract? (2) Did [Structures] declare Action to be in default under the offsite subcontract? (3) If [Structures] did not declare Action to be in default, did it fail to fulfill an obligation imposed by law? (4) If [Structures] did not declare Action to be in default, did it breach a promise made in the offsite subcontract or the bond? (5) If [Structures] did not declare Action to be in default, did it fail to fulfill a condition included in the offsite subcontract and thereby relieve [West] of its duty to pay under the bond? After making these inquiries, we briefly examine the payment bond and a particular case on which [West] is relying.

1
Our first inquiry is whether Action materially breached the offsite contract. The trial court so determined, and no one assails that determination in this appeal. Accordingly, we hold that Action materially breached the offsite contract.

2
Our second inquiry  whether [Structures] declared Action to be in default under the subcontract  has three parts. (a) When is a principal in default under a subcontract? (b) When does an obligee "declare" a principal to be in default under a subcontract? (c) Did [Structures] make such a declaration here?
Turning to (a), we distinguish between "breach" and "default." Utilizing the concept of "material breach" that we discussed above, the Fifth Circuit explained in L & A Contracting Co. v. Southern Concrete Services, Inc.:37
Although the terms "breach" and "default" are sometimes used interchangeably,[38] their meanings are distinct in construction suretyship law. Not every breach of a construction contract constitutes a default sufficient to require the surety to step in and remedy it. To constitute a legal default, there must be a(1) material breach or series of material breaches (2) of such magnitude that the obligee is justified in terminating the contract.39
Agreeing with L & A in this respect,40 we hold that a principal is "in default under the subcontract" if he or she materially breaches the subcontract, thereby permitting (but not requiring) the obligee to terminate or cancel the subcontract.
The answer to (b) follows logically from the answer to (a). If a principal is "in default under the subcontract" when he or she has materially breached the subcontract, thereby permitting but not requiring the obligee to terminate the subcontract, an obligee "declares" a principal to be in *1133 default when, having elected to treat the breach as "material," the obligee announces his or her intent to terminate the subcontract.
Turning to (c), we observe that even though Action's breach was material, [Structures] never elected to treat it as such. Nor did [Structures] declare an intent to terminate the offsite subcontract. Instead, [Structures] opted to continue Action's performance and seek damages at the end. Necessarily then, [Structures] did not declare Action to be in default under the offsite subcontract.

3
Our third inquiry is whether [Structures], by not declaring Action to be in default, failed to fulfill an obligation imposed by law. As discussed above, the law permits but does not require a nonbreaching promisee/obligee to declare a default (i.e., to declare a material breach and announce its intention to terminate the contract). Instead, the law gives the promisee/obligee the option to declare a default, terminate the contract, and sue for damages (if any) incurred to date; or, alternatively, to continue the contract in effect and sue for damages incurred when performance is finished. By electing the latter course of action, [Structures] did not fail to fulfill an obligation imposed by law.

4
Our fourth inquiry is whether [Structures], by not declaring Action to be in default, breached a promise made in the offsite subcontract or in the bond. Like the law itself, the subcontract gave [Structures] the option to declare a default, but it did not obligate [Structures] to declare a default or terminate the subcontract; as quoted above, it stated only that if Action failed to perform, [Structures] "may . . . terminate this Subcontract."41 The only place in which the bond even mentions a declaration of default is Paragraph C, which merely recognizes and describes the remedies that follow from a declaration of default. By failing to declare a default, [Structures] did not breach a promise made in the subcontract or the bond.

5
Our fifth inquiry is whether [Structures], by not declaring a default, failed to fulfill a condition to [West]'s liability and thereby relieved [West] of its duty to pay on the bond. As discussed above, Paragraph A of the bond makes [West] liable to [Structures]. Paragraph B explicitly states that [West] will continue to be bound until Action promptly and faithfully performs. By using the word "otherwise," Paragraph B explicitly eliminates all other conditions  including a declaration of default by [Structures]. The preamble to Paragraph C sets forth three events (the principal's default, the obligee's declaration of default, and the obligee's performance) that constitute conditions precedent to the use of the remedies and damages described in Paragraph C, but not conditions precedent to the liability created in Paragraph A.42 [West]'s liability on the bond was not conditioned on a declaration of default, and [Structures]'s failure to make such a declaration did not relieve [West] of its duty to pay on the bond.
An examination of [West]'s payment bond confirms these conclusions, for it clearly demonstrates that [West] could have added  but did not add  conditions to Paragraph A of the performance bond. Issued simultaneously with the performance bond, the payment bond states in part:
[A] Action Excavating & Paving, Inc. . . ., hereinafter called Principal, and Insurance Company of the West . . ., hereinafter called Surety, are held and firmly bound unto CSI Construction Co. . . ., hereinafter called Obligee, for the use and benefit of claimants as hereinbelow defined, in the amount of . . . $472,290. . . .
[B] WHEREAS, Principal has . . . entered into a subcontract with Obligee . . ., which subcontract is by reference made a part hereof, and is hereafter referred to as the subcontract.

*1134 NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION is such that if the Principal shall promptly make payment to all claimants as hereinafter defined, for all labor and material used or reasonably required for use in the performance of the subcontract, then this obligation shall be void; otherwise it shall remain in full force and effect, subject, however, to the following conditions. . . . [43]
[West] relies heavily on L & A Contracting v. Southern Concrete Services,44 a 1994 Fifth Circuit case.45 Southern, a subcontractor and bond principal, "failed to provide sufficient concrete . . . in a timely manner and breached the subcontract in numerous other particulars."46 L & A, a general contractor and bond obligee, demanded that F & D, the bond surety, "`take the necessary steps to fulfill this contract to prevent any further delays and costs. . . . '"47 Rather than opting to declare a default and terminate Southern's subcontract, L & A allowed Southern to complete its performance, then sued Southern and F & D for damages based on Southern's failure to promptly and faithfully perform. The trial court found that Southern had breached the subcontract and granted judgment against both defendants. On appeal, the Fifth Circuit failed to analyze the bond's language. 48 Instead, it began by asserting:
We turn first to F & D's appeal. As a surety, F & D's liability is governed by the terms of its bond with L & A. While Southern is, of course, directly liable for its own breach of contract, the bond in this case imposes liability on F & D for Southern's breach only if two conditions exist. First, Southern must have been in default of its performance obligations under the subcontract. Second, L & A must have declared Southern to be in default.49
The Fifth Circuit concluded that because L & A had failed to declare a default, the second of these conditions had failed, thereby relieving F & D of its duty to perform on the bond.
The linchpin of the L & A court's conclusion is its assertion, italicized above, that the events described in the preamble to Paragraph C condition not just the use of the remedies described in Paragraph C, but also the liability described in Paragraph A.50 To so hold, however, plainly violates the language of the bond. As already discussed, Paragraphs A and B of the bond create liability, subject to a single express condition subsequent (the principal's prompt and faithful performance). By using the word "otherwise," Paragraph B explicitly eliminates any other conditions on liability. Paragraph C imposes express conditions precedent (including that the principal be "in default" and that the obligee have declared the principal to be in default) on the use of the remedies described therein, but not on the liability described in Paragraphs A and B. Believing that L & A was wrongly decided,51 we decline to follow it except as already indicated.52
Concluding our discussion of the first issue, we reject [West]'s claim that it cannot be liable because [Structures] opted to continue Action's contract instead of declaring Action to be in default; we agree with the trial court that "[Structures] gave [West] adequate notice"53 under Washington law;54 and we hold that [West] is liable on the performance bond.
3 2 CP at 82 (capitalization removed).
13 Br. of Appellant at 13 (emphasis omitted).
14 Br. of Appellant at 13 (emphasis omitted).
15 Joint Admin. Bd. v. Fallon, 89 Wash.2d 90, 94, 569 P.2d 1144 (1977); Walter Concrete Constr. Co, v. Lederle Labs., 99 N.Y.2d 603, 788 N.E.2d 609, 758 N.Y.S.2d 260 (2003).
16 Fallon, 89 Wash.2d at 94, 569 P.2d 1144.
17 McCombs Constr., Inc. v. Barnes, 37 Wash.App. 91, 93, 678 P.2d 837, review denied, 102 Wash.2d 1002 (1984); McIntyre v. Fort Vancouver Plywood Co., 24 Wash.App. 120, 127, 600 P.2d 619 (1979).
18 Wagner v. Wagner, 95 Wash.2d 94, 101, 621 P.2d 1279 (1980); Allstate Ins. Co. v. Huston, 123 Wash.App. 530, 542 n. 29, 94 P.3d 358 (2004).
19 Am. Nat'l Fire Ins. Co. v. B & L Trucking & Constr. Co., 134 Wash.2d 413, 428, 951 P.2d 250 (1998); Stouffer & Knight v. Cont'l Cas. Co., 96 Wash.App. 741, 749, 982 P.2d 105 (1999), *1135 review denied, 139 Wash.2d 1018, 994 P.2d 849 (2000).
20 Fallon, 89 Wash.2d at 94, 569 P.2d 1144; accord, Estate of Jordan v. Hartford Accident & Indem. Co., 120 Wash.2d 490, 497, 844 P.2d 403 (1991); Nat'l Bank v. Equity Investors, 86 Wash.2d 545, 555, 546 P.2d 440 (1976).
21 Ross v. Harding, 64 Wash.2d 231, 236, 391 P.2d 526 (1964).
22 Stewart v. Chevron Chem. Co., 111 Wash.2d 609, 613, 762 P.2d 1143 (1988) (emphasis omitted) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 2 (1981)).
23 Ross, 64 Wash.2d at 236, 391 P.2d 526.
24 LAURENCE P. SIMPSON, HANDBOOK OF THE LAW OF CONTRACTS § 144, at 300 (2d ed. 1965) (SIMPSON ON CONTRACTS).
25 Cartozian & Sons, Inc. v. Ostruske-Murphy, Inc., 64 Wash.2d 1, 5-6, 390 P.2d 548 (1964); Jacks v. Blazer, 39 Wash.2d 277, 285, 235 P.2d 187 (1951); SIMPSON ON CONTRACTS, supra, § 158, at 329.
26 Pronger v. Old Nat'l Bank, 20 Wash. 618, 626, 56 P. 391 (1899); Wilkinson v. Smith, 31 Wash.App. 1, 13, 639 P.2d 768, review denied, 97 Wash.2d 1023 (1982) (quoting Labor Hall Ass'n v. Danielsen, 24 Wash.2d 75, 81, 163 P.2d 167 (1945)).
27 Cartozian & Sons, 64 Wash.2d at 5-6, 390 P.2d 548 ("any breach will give rise to cause of action for damages"); RESTATEMENT (SECOND) OF CONTRACTS § 346 cmt. a ("Every breach of contract gives the injured party a right to damages against the party in breach, unless the contract is not enforceable against that party. . . ."); see also Ross, 64 Wash.2d at 236, 391 P.2d 526; Tacoma Northpark, L.L.C. v. NW, L.L.C., 123 Wash.App. 73, 79, 96 P.3d 454 (2004) (citing Ross, 64 Wash.2d at 236, 391 P.2d 526).
28 SIMPSON ON CONTRACTS, supra, § 187, at 377; see also SIMPSON ON CONTRACTS § 158, at 329.
29 2 CP at 82.
30 2 CP at 82.
31 2 CP at 82 (capitalization removed; emphasis added).
32 See Fallon, 89 Wash.2d at 95, 569 P.2d 1144 ("Generally, a bond is effective when delivered and accepted.").
33 We have no occasion to consider or address Paragraph D in this case.
34 Subparagraph (1) permits [West] to step in and rectify Action's performance if [Structures] elects to declare Action in default. Subparagraph (2) permits [Structures] to arrange substitute performance after reasonable notice to [West], or, alternatively, to demand that [West] arrange such performance. Subparagraph (3) describes measures of damage.
35 2 CP at 82.
36 12 ARTHER (sic) LINTON CORBIN, CORBIN ON CONTRACTS § 1227, at 530 n. 90 (1993) ("An express provision for one remedy in case of breach is not operative as a `waiver' of other remedies that are available at law.").
37 17 F.3d 106 (5th Cir.1994).
38 See, e.g., Emrich v. Connell, 41 Wash. App. 612, 626-27, 705 P.2d 288 (1985), rev'd on other grounds, 105 Wash.2d 551, 716 P.2d 863 (1986).
39 L & A Contracting Co., 17 F.3d at 110.
40 We disagree with L & A in other respects, for reasons discussed below.
41 2 CP at 72 (§ 6(b)(12)) (emphasis added).
42 Even if we assume Paragraph C is ambiguous in this respect-an assumption we do not think is true-we must construe Paragraph C "in favor of liability of the surety." Fallon, 89 Wash.2d at 94, 569 P.2d 1144; Estate of Jordan, 120 Wash.2d at 497, 844 P.2d 403; Nat'l Bank, 86 Wash.2d at 555, 546 P.2d 440.
43 2 CP at 83 (capitalization removed; emphasis added).
44 17 F.3d 106.
45 [West] also relies on cases that have followed L & A. See, e.g., Elm Haven Constr. Ltd. P'ship v. Neri Constr. L.L.C., 376 F.3d 96 (2d Cir.2004); Balfour Beatty Constr., Inc. v. Colonial Ornamental Iron Works, Inc., 986 F.Supp. 82 (D.Conn.1997). These cases add nothing to L & A itself, so we omit them from the text. We also note that other cases have declined to follow or distinguished L & A. E.g., Cates Constr., Inc. v. Talbot Partners, 21 Cal.4th 28, 980 P.2d 407, 414-15, 86 Cal.Rptr.2d 855 (1999) (declining to follow L & A on a point other than the one in issue here); U.S. Fid. & Guar. Co. v. Braspetro Oil Serv. Co., 369 F.3d 34, 57 (2d Cir.2004) (distinguishing L & A); DCC Constructors, Inc. v. Randall Mech., Inc., 791 So.2d 575, 577 (Fla. Dist.Ct.App.2001) (distinguishing L & A).
46 L & A Contracting, 17 F.3d at 108.
47 L & A Contracting, 17 F.3d at 108.
48 This same kind of failure caused the California Supreme Court not to follow L & A and its precursor, American Home Assurance Co. v. Larkin General Hospital, Ltd., 593 So.2d 195 (Fla.1992), on the matter of delay damages. Cates Constr., Inc., 86 Cal.Rptr.2d 855, 980 P.2d at 414-15.
49 L & A Contracting, 17 F.3d at 109 (emphasis added; emphasis removed).
50 [West] asserts that the bond in L & A was "identical" to the bond here. Br. of Appellant at 17. The opinion in L & A does not show the entire bond there in issue  it fails to quote Paragraphs A and B, for example  but the parts it does show are the same. Accordingly, we assume that [West]'s assertion is true. If the bond in L & A was materially different from the bond here, L & A is distinguishable and has no bearing here.
51 Accord, Walter Concrete, 758 N.Y.S.2d 260, 788 N.E.2d at 610 (rejecting surety's assertion that it was not liable because "it had not received a declaration of default which . . . was *1136 a necessary precursor to its liability under the bond").
52 As explained earlier, we agree with L & A insofar as it distinguishes between "breach" and "default."
53 5 CP at 664.
54 Molin v. New Amsterdam Cas. Co., 118 Wash. 208, 212, 203 P. 8 (1922); Parsons v. Pac. Sur. Co., 69 Wash. 595, 597, 125 P. 954 (1912); Lazelle v. Empire State Sur. Co., 58 Wash. 589, 592, 109 P. 195 (1910); Denny v. Spurr, 38 Wash. 347, 352, 80 P. 541 (1905).
Colorado Structures, 125 Wash.App. at 911-24, 106 P.3d 815 (some alterations in original).[11]
¶ 12 We agree.

ATTORNEY FEES
¶ 13 The trial court declined to award Olympic Steamship attorney fees but did award attorney fees under the contract. The net result was to limit the attorney fees awarded against West to the penal amount set by the bond. The Court of Appeals reversed, holding that Olympic Steamship does apply. Again, we agree.
¶ 14 In Olympic Steamship, this court held that "[a]n insured who is compelled to assume the burden of legal action to obtain the benefit of its insurance contract is entitled to attorney fees." Olympic S.S., 117 Wash.2d at 54, 811 P.2d 673. Such attorney fee awards are often called Olympic Steamship attorney fees. But Olympic Steamship attorney fees are not awarded merely because an insurer challenges liability or damages. Dayton v. Farmers Ins. Group, 124 Wash.2d 277, 280, 876 P.2d 896 (1994). West and amici argue that Olympic Steamship attorney fees should not be applied in this case.
¶ 15 They offer several arguments to support their contention. First, they note that while this court and the Court of Appeals have previously applied Olympic Steamship to actions arising out of surety bonds, see, e.g., Estate of Jordan v. Hartford Accident & Indem. Co., 120 Wash.2d 490, 844 P.2d 403 (1993); Axess Int'l Ltd. v. Intercargo Ins. Co., 107 Wash.App. 713, 30 P.3d 1 (2001), this court has not applied Olympic Steamship specifically to disputes arising out of performance bonds.
¶ 16 We have considered a somewhat similar question once before. In Estate of Jordan, we found an insurer liable under a fidelity bond and awarded the insured's assignee reasonable attorney fees pursuant to Olympic Steamship. Estate of Jordan, 120 Wash.2d at 492, 844 P.2d 403. A "fidelity bond" is "a bond or other form of contract for indemnifying an employer against financial loss due to the dishonesty of an employee." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 845 (2003). West contends that this is distinguishable *1137 because a fidelity bond, like the one in Estate of Jordan and unlike a performance bond, is generally treated like an insurance contract. However, given the underlying principles of Olympic Steamship and the nature of a performance bond, which guarantees the performance of the principal, we fail to find a material distinction. Indeed, all surety bonds are regarded as "in the nature" of insurance contracts, and controlled by the rules of interpretation of such contracts. Nat'l Bank of Wash. v. Equity Investors, 86 Wash.2d 545, 551, 553, 546 P.2d 440 (1976). There seems little basis for us to create an exception for performance bonds.
¶ 17 West and amici also contend that this court in Estate of Jordan, and the Court of Appeals in Axess, failed to take into account one reason behind the attorney fee rule articulated in Olympic Steamship  that of the unequal bargaining power between an insurance company and its policyholder  before awarding Olympic Steamship attorney fees.[12] Both dissenting opinions adopt this position, arguing there are "critical differences between suretyship and insurance." Dissent at 1150 (Madsen, J., dissenting). West, and the dissenting opinions, draw our attention to a California Supreme Court case, Cates Constr. Inc. v. Talbot Partners, 21 Cal.4th 28, 980 P.2d 407, 86 Cal.Rptr.2d 855 (1999). In Cates, the California court distinguished construction performance bonds from insurance policies, holding that in the construction bond context, the surety and obligee are not in unequal bargaining positions. Id. at 52-54, 86 Cal.Rptr.2d 855, 980 P.2d 407. West, and the dissenters, rely on Cates for the factual assertion that construction contractors and the financial institutions issuing surety bonds have relatively equal bargaining positions. We disagree with this factual premise.
¶ 18 We note, first of all, that Cates did not consider attorney fees nor address the equitable grounds which might warrant an award of attorney fees. The issue in Cates was whether the trial court properly recognized tort remedies for breach of the covenant of good faith and fair dealing in the context of performance bonds. Id. at 34, 86 Cal. Rptr.2d 855, 980 P.2d 407. The California court balked at the prospect of exposing sureties to tort remedies for what was essentially a breach of contract. In Cates, the punitive damages the plaintiff collected were $15 million (reduced from the jury's award of $28 million), as compared to $2.5 million in damages from the failure to perform the contract. Cates concerns itself with the line between contract and tort; it says nothing about whether attorney fees should be awarded.
¶ 19 We are also hesitant to rely on California case law in this area because California regulatory and statutory laws are so different from our own. Among the reasons the California Supreme Court rejected tort remedies against sureties was the stiff penalties under California's Unfair Trade Practices Act that penalized improper denials of coverage. Id. at 58, 86 Cal.Rptr.2d 855, 980 P.2d 407 (citing CAL. INS.CODE § 790.03(h)). These penalties, they reasoned, offered incentives to sureties to comply with their bond agreements such that tort remedies were unnecessary. Cates, 21 Cal.4th at 58, 86 Cal.Rptr.2d 855, 980 P.2d 407. The Cates case did not deal with either the issues or the equities presented in the case before us.
¶ 20 More significantly, the California Supreme Court's presumption of equal bargaining power between sureties and contractors is a minority position, nationally. See id. at 60, 86 Cal.Rptr.2d 855, 980 P.2d 407. In fact, the Cates decision passed by a closely divided majority, 4-3, of the California court. The dissent rejected the premise the financial institution in Cates would, as equals, negotiate with contractors rather than employ standard form contracts:
In any event, the majority do not show any evidence that the performance bond terms in this case were negotiated, and appear to concede the point (maj. opn., ante, at p. 1142 [referring to "the typical performance *1138 bond"]). It is unlikely that a mammoth insurer like Transamerica  an economic entity that counts money in the billions of dollars and dwarfed the now defunct Talbot and Cates when they were in business  would engage in negotiations for the relatively small custom involved here.
Id. at 64, 86 Cal.Rptr.2d 855, 980 P.2d 407 (alteration in original) (Mosk, J., dissenting). The majority of courts to reach the question faced in Cates have sided with California's dissent. Id. at 60, 86 Cal.Rptr.2d 855, 980 P.2d 407 (citing Transamerica Premier Ins. Co. v. Brighton Sch. Dist. 27J, 940 P.2d 348 (Colo.1997); Loyal Order of Moose, Lodge 1392 v. Int'l. Fid. Ins. Co., 797 P.2d 622 (Alaska 1990); Dodge v. Fid. & Deposit Co. of Md., 161 Ariz. 344, 778 P.2d 1240 (1989); Szarkowski v. Reliance Ins. Co., 404 N.W.2d 502 (N.D.1987); K-W Indus. v. Nat'l Sur. Corp., 231 Mont. 461, 754 P.2d 502 (1988)). One convincing reason that stands out is the use of form contracts. The majority in Cates observed that the financial institution issued form bonds, but was unconcerned, noting:
It is of no significance that the bond terms here appeared on a standard form published by the American Institute of Architects (AIA). That organization, as its name suggests, is not one that exists to advance the interests of surety companies. The AIA generally promulgates its forms pursuant to an inclusive drafting policy that encourages input from a variety of outside groups and individuals.
Cates, 21 Cal.4th at 53 n. 16, 86 Cal.Rptr.2d 855, 980 P.2d 407. This case gives us no occasion to consider whether tort remedies should be available, but we agree that the relative positions of the contractor and the surety compel, pursuant to Olympic Steamship, an award of attorney fees when the surety wrongfully denies coverage. The crucial fact is that sureties, like insurance companies, face minimal incentive to perform on their contracts if the maximum loss they may incur is the amount of the bond, especially since the transaction costs of litigation are likely to dissuade contractors who would otherwise assert their right to full payment in court.[13]
¶ 21 The process for purchasing surety performance bonds is much like the process for purchasing insurance contracts. A contractor seeking a bond contacts an agent whose "job is to help convince a surety company to issue the bond." In re Tech. for Energy Corp., 140 B.R. 214, 215-16 (E.D.Tenn.1992) (reporting on the "basic rules and practices in the surety business"). The bond application is then reviewed by underwriters for the surety company who decide if the surety will or will not issue the bond. Id. The bonds are purchased with the payment of a premium, after which a surety requires no further performance by the obligee or the principal: the surety upon receipt of the premium has all it will ever get from the contract. See Steven M. Siegfried, Introduction to Construction Law 83 (1987). The surety's position is like an insurance company-it calculates premiums based on the risk that it may have to make a payment. In re Tech. for Energy Corp., 140 B.R. at 215-16. It is, like an insurance company, in a surety's financial interest to withhold payment. Ideally, a surety collects premiums and never pays claims. We found this situation untenable in the context of insurance contracts and, in Olympic Steamship, were compelled to *1139 award attorney fees to the insured to "encourage the prompt payment of claims." Olympic S.S., 117 Wash.2d at 53, 811 P.2d 673. Such encouragement is equally appropriate for surety bonds. We read Olympic Steamship as including performance bonds.
¶ 22 When an event occurs that arguably triggers the surety or insurance company's duty to make payments, the parties may dispute whether payment is in fact owed. The disparity of power, at this point in the relationship, is compelling. Sureties may be tempted to withhold payment in every case, gambling that the transaction costs of litigation will dissuade even a percentage of their obligees from asserting their right to payment. If the maximum risk to the surety is the penal amount of its bond, a surety has nothing to lose. The obligee has no leverage over the surety to compel payment, except litigation. If the transaction costs of litigation are too high relative to the bond, obligees will simply cut their losses.
¶ 23 This unfortunate reality hits the smallest construction companies hardest, as their projects are less expensive and thus so are their bonds. A construction company facing a surety refusing to pay several thousand dollars on a bond, after consulting an attorney, will likely decide that the transaction costs are too great to move forward with litigation. The surety, risking only the value of the bond, may be motivated to withhold payment. As our court held in Olympic Steamship, principles of equity require courts to award attorney fees to the obligee to remedy the disparity inherent to these financial relationships. Olympic S.S., 117 Wash.2d at 52, 811 P.2d 673 (citing Hayseeds, Inc. v. State Farm Fire & Cas., 177 W.Va. 323, 352 S.E.2d 73, 77 (1986)). The disparity of power between surety and obligee is, with respect to compulsion of performance, identical to the disparity between insurers and the insured.
¶ 24 The disparity of bargaining power is relevant, but more important is the disparity of enforcement power. West, amici, and the dissenters, place too much emphasis on one phrase found in Olympic Steamship. In Olympic Steamship, we noted, "Other courts have recognized that disparity of bargaining power between an insurance company and its policyholder makes the insurance contract substantially different from other commercial contracts." Olympic S.S., 117 Wash.2d at 52, 811 P.2d 673. While our opinion in Olympic Steamship made reference to disparity of bargaining power, it focused far more on preventing an insured from bearing the burden of an insurer's improper refusal to provide coverage. Id. Generally speaking, insurance contracts have a different purpose than most other contracts for indemnity. The insured pays a premium, not to prevent an event, but to provide immediate liquid resources to weather the effects of an emergency. Fire or flood insurance is not to prevent fires or floods but is to provide cash for temporary housing, repair and rebuilding, and replacement of necessary household goods. The victim of a fire or flood needs the benefits of his insurance policy when he is without shelter, not "`vexatious, time-consuming, expensive litigation with his insurer.'" Id. (quoting Hayseeds, 352 S.E.2d at 79). Part of the purpose of medical insurance is to provide medical care in the event of a medical emergency. If the bills are not promptly paid, medical services many not be available, and one's health and economic well-being is at risk. Disability insurance is to immediately replace the stream of income desperately needed by a family faced with an unexpected disability. If the disability insurance is not received, rent and other bills may not be paid, lawsuits and financial ruin could follow. It is thus the special and unique feature of insurance that money be made promptly available to prevent bad situations from getting worse. A significant purpose of an insurance contract is frustrated if, in order to gain the benefits of the contract, the insured is forced to engage in costly and time consuming litigation.[14]
*1140 ¶ 25 West argues that those who enter into commercial contracts containing indemnity agreements are not subject to Olympic Steamship attorney fees. It reasons that a contract to issue a performance bond is just like any other commercial contract. We disagree. Generally, the primary purpose of a business contract is the purchase and sale of some interest or the furtherance of some commercial enterprise; indemnity clauses in such agreements are secondary to the primary purpose. Unlike indemnity agreements found in most commercial contracts, the sole purpose of the insurance agreement is prompt payment if the triggering event occurs. Often, those entering into such commercial agreements who want immediate funds to cover adverse events will buy insurance.
¶ 26 There is little to distinguish construction performance bonds from other forms of insurance.[15] The dissent's suggestion that sureties are not obligated to promptly remedy the principal's default, either by infusing cash or replacing the subcontractor, is doubtful considering the standard form bond in this case which requires the surety to "promptly remedy" the principal's default. The dissent may be correct that "a surety usually may elect to `do nothing,' leave completion of the contract to the obligee, and then compensate the obligee for its damages." Dissent at 1152 (Madsen, J., dissenting). But that hardly means that an obligee does not depend on the timely "compensation" in the same way an insured does. For example, Structures, facing great penalties for delay, elected to perform Action's work itself. Upon completion, Structures needed the proceeds of the bond to pay its employees and suppliers; Structures did not need protracted litigation. A surety may elect to pay the obligee rather than attempt completion of the principal's work, but the remedy it elects must still be delivered "promptly" to avoid a greater calamity than the principal's breach.
¶ 27 The case at hand amply demonstrates the extent to which obligees rely on prompt and certain payment. Structures was the general contractor obligated to build a store for Wal-Mart. If it failed to finish the work on time, it faced huge penalties. Structures needed to subcontract out some of the work. Structures knew if its subcontractor failed to perform in a timely manner, Structures needed the additional resources to perform the work on time. A mere indemnity agreement, from Action, whereby Action indemnified Structures for any breach, would have been insufficient. Instead, West was brought into the relationship. West agreed to perform Action's obligations under the subcontract.[16] For assuming the risk of having to pay or perform the work if Action failed to do so, West charged a premium. Structures' purpose in requiring the performance bond was to ensure completion of Action's contract so that Wal-Mart could have its grand opening on October 14, 1998. This is substantially similar to the situation *1141 before the court in Olympic Steamship, and we agree with the Court of Appeals that it applies.
¶ 28 Next, we turn to the contention that this case involves a claims dispute, as opposed to a coverage dispute, and that, therefore, even if this court holds that Olympic Steamship applies to surety bonds, it should not apply in this case. Cf. Olympic S.S., 117 Wash.2d at 52, 811 P.2d 673. We disagree. West refused to pay any claim based upon its legal interpretation of the bond. Since the question is a legal one, which required Structures to litigate to obtain a declaratory judgment ruling regarding the meaning of the contract, it is a coverage dispute. Generally, when an insured must bring suit against its own insurer to obtain a legal determination interpreting the meaning or application of an insurance policy, it is a coverage dispute. This case would be in the nature of a claims dispute if West had agreed to pay under the bond, but had a factual dispute with Structures as to the amount of the payment. See Dayton, 124 Wash.2d at 280, 876 P.2d 896. In the words of Judge Morgan:

Olympic Steamship applies when an insurer or similar obligor contests the meaning of a contract, but not when it contests other questions as, for example, its liability in tort or the amount of damages it should pay. Given that [West] has vigorously contested the meaning of its bond throughout the case, [Structures] has been able to obtain the benefit of the bond, for which it paid a significant premium, only through legal action. Accordingly, Olympic Steamship applies here.
Colorado Structures, 125 Wash.App. at 928, 106 P.3d 815 (emphasis added) (footnote omitted). We agree.
¶ 29 Lastly, in McGreevy, where this court awarded reasonable attorney fees in addition to the limits of the insurance policy, we reasoned, "when an insurer unsuccessfully contests coverage, it has placed its interests above the insured. Our decision in Olympic Steamship remedies this inequity by requiring that the insured be made whole." McGreevy, 128 Wash.2d at 39-40, 904 P.2d 731. Likewise, West placed "its interests" above that of Structures. Id. Structures should be awarded attorney fees under Olympic Steamship, so as to be made "whole." Dayton, 124 Wash.2d at 280, 876 P.2d 896 (holding that a court has power to award attorney fees when authorized by "contract, statute, or recognized ground of equity"). Without the application of Olympic Steamship and awarding attorney fees in addition to the policy limits of a surety bond when appropriate, an insurer would have absolutely no incentive to refrain from litigation over even the most clear coverage provisions.[17]

CONCLUSION
¶ 30 We conclude that under the plain language of the contract, Structures was not *1142 required to formally declare Action in default to trigger the performance bond issued by West. Olympic Steamship attorney fees apply to performance bonds. We affirm the Court of Appeals and remand for any other proceedings not inconsistent with this opinion.
WE CONCUR: CHARLES W. JOHNSON, SUSAN OWENS and BOBBE J. BRIDGE, JJ.
ALEXANDER, C.J. (concurring in part, dissenting in part).
¶ 31 I agree with the majority opinion in every respect but one. I part company with the majority only insofar as it holds that Colorado Structures, Inc., is entitled to socalled Olympic Steamship[1] attorney fees. In my view, the trial court correctly concluded that it was not. I, therefore, dissent from the majority's holding that "Olympic Steamship attorney fees apply to performance bonds." Majority at 1142.
¶ 32 In Olympic Steamship Co. v. Centennial Insurance Co., 117 Wash.2d 37, 52, 811 P.2d 673 (1991), this court extended "the right of an insured to recoup attorney fees that it incurs because an insurer refuses to defend or pay the justified action or claim of the insured." Although our court did not set out its reasons for reaching this conclusion in great detail, it should be readily apparent to a reader of the opinion that this departure from the American rule governing entitlement to attorney fees[2] was primarily based on what our court said was the "disparity of bargaining power between an insurance company and its policyholder." Id. This, we said, "makes the insurance contract substantially different from other commercial contracts." Id. (citing Hayseeds, Inc. v. State Farm Fire & Cas., 177 W.Va. 323, 352 S.E.2d 73, 77 (1986)).
¶ 33 The majority extends the Olympic Steamship reasoning to performance bonds. Unfortunately, it makes this leap unaided by any empirical evidence that the disparity in bargaining power between insurance companies and their policyholders, which was of concern to our court in Olympic Steamship, is extant in the relationship between contractors and companies that issue performance bonds. The majority dispatches this issue with the brief comment that "[t]here seems little basis for us to create an exception for performance bonds." Majority at 1137. The flaw in this reasoning is that there is currently no authority for the proposition that performance bonds fall under Olympic Steamship, and, thus, it cannot be said that Colorado Structures is seeking to be excepted from that decision. Rather it is this court that is extending the Olympic Steamship exception to the American rule on attorney fees. In my judgment, we should not do so without a showing that there is unequal bargaining power between issuers of performance bonds and contractors. Plainly, no such showing has been made.
¶ 34 Indeed, there is authority from the highest court of the state of California, which supports the notion that "the typical performance bond bears no indicia of adhesion or disparate bargaining power." Cates Constr., Inc. v. Talbot Partners, 21 Cal.4th 28, 980 P.2d 407, 422, 86 Cal.Rptr.2d 855 (1999). In that case, the California court engaged in an extensive discussion of the difference between construction performance bonds and insurance policies and concluded that the bonds differ from insurance policies in that the "the surety and obligee are not in unequal bargaining positions." Majority at 1137 (citing Cates, 21 Cal.4th at 52-54, 86 Cal.Rptr.2d 855, 980 P.2d 407). The California court went on to say:
Unlike the vast majority of insureds who must accept insurance on a "take-it-or-leave-it" basis, "obligees decide the form of the bond which they will accept from the principal, thus they can require terms which provide an incentive to the surety to timely pay claims, such as attorneys' fees *1143 and interest." If the obligee does not agree with the terms of the bond secured by the principal, it may consent to a modification of the underlying contract or may end bargaining altogether and seek a different principal whose financial resources and qualifications enable it to procure a bond with acceptable terms. Hence, obligees generally possess ample bargaining power to negotiate for favorable bond terms.
Cates, 86 Cal.Rptr.2d 855, 980 P.2d at 422 (citations omitted). The majority essentially eschews this authority, stating simply, "We disagree with this factual premise." Majority at 1137.
¶ 35 As noted above, our decision in Olympic Steamship was a substantial departure from the American rule that generally governs the awarding of attorney fees. We should be slow to extend the Olympic Steamship exception to that rule, particularly in cases, like this, where there is no showing that the economic reasons underlying that opinion are present. Without such a showing, it is hard for me to conclude that a contract to issue a performance bond differs from a run-of-the-mill commercial contract.
¶ 36 I, therefore, dissent from the majority's conclusion that Colorado Structures is entitled to an award of attorney fees pursuant to Olympic Steamship, 117 Wash.2d 37, 811 P.2d 673.
I CONCUR: JAMES M. JOHNSON, J.
SANDERS, J. (dissenting).
¶ 37 Colorado Structures, Inc. (Structures) subcontracted with Action Excavating and Paving, Inc. (Action) to help build the sewer system for a Wal-Mart store. Insurance Company of the West, Inc. (West), acting as a surety, issued a performance bond guaranteeing Action's work. Concerned about Action's progress, Structures supplemented Action's crews but did not terminate the subcontract with Action. Structures never declared Action to be in default under the subcontract. Majority at 1133. Action subsequently failed to satisfactorily perform and breached the subcontract and Structures now seeks payment from West under the performance bond.
¶ 38 The majority holds Structure's failure to declare default did not relieve West of its duty to pay on the bond. Majority at 1144. But in my view, Structures' failure to formally declare Action in default was fatal, and as a consequence West has no obligation to pay under the bond.
¶ 39 In L & A Contracting the Fifth Circuit Court of Appeals holds a clear, direct, and unequivocal declaration of default must be made before a surety's obligations under a performance bond are triggered. L & A Contracting Co. v. S. Concrete Servs., 17 F.3d 106, 111 (5th Cir.1994). The court clarifies, "[t]he declaration must inform the surety that the principal has committed a material breach or series of material breaches of the subcontract, that the obligee regards the subcontract as terminated, and that the surety must immediately commence performing under the terms of its bond." Id. at 1148. The Second Circuit Court of Appeals and the United States District Court for the District of Connecticut have both followed the Fifth Circuit's reasoning. See Elm Haven Constr. Ltd. P'ship v. Neri Constr., LLC, 376 F.3d 96, 101 (2d Cir.2004) (upholding requirement that obligee formally declare default); Balfour Beatty Constr., Inc. v. Colonial Ornamental Iron Works, 986 F.Supp. 82, 86 (D.Conn.1997) (letters mentioning principal's delay in performance did not provide sufficient notification to surety that principal was in default and relieved surety of liability under the performance bond). Other authorities on performance bonds agree the three preconditions to the surety's liability under such a bond are "(1) the default by the principal; (2) the obligee's declaration of default; and (3) last, that the obligee itself has not breached the contract." 2 ROBERT F. CUSHMAN & JAMES J. MYERS, CONSTRUCTION LAW HANDBOOK § 35.04[B], at 1281 (1999) (emphasis added).
¶ 40 The majority offers no compelling reason for rejecting such authority, and its interpretation of the performance bond contract is flatly at odds with the purpose of a performance bond. A "performance bond" is a "surety bond guaranteeing faithful performance *1144 of a contract." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1678 (2002). See also U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co., 369 F.3d 34 (2d Cir.2004) ("[T]he very purpose of a performance bond is `to assure completion of the contract.'" (quoting Pearlman v. Reliance Ins. Co., 371 U.S. 132, 140, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962))). Surety bonds on construction projects shift the risk of the contractor's nonperformance from the owner/obligee to the surety. 2 CUSHMAN & MYERS, supra, § 35.03, at 1278. Under a performance bond, the job of the surety (West) is to complete the subcontract (or assume risk of noncompletion) once the obligee has declared default; it is not the job of the surety to reimburse the obligee (Structures) for the faulty or poor performance of the principal (Action) once the work is complete.
¶ 41 The bond at issue reads as follows:
[A] Action Excavating & Paving, Inc. . . ., hereinafter called Principal, and Insurance Company of the West . . ., hereinafter called Surety, are held and firmly bound unto CSI Construction Co. . . ., hereinafter called Obligee, in the amount of . . . $472,290.00. . . .
[B]WHEREAS, Principal has . . . entered into a subcontract with Obligee . . ., which subcontract is by reference made a part hereof, and is hereinafter referred to as the subcontract, NOW THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH THAT, if Principal shall promptly and faithfully perform said subcontract, then this obligation shall be null and void; otherwise it shall remain in full force and effect.
[C] Whenever Principal shall be, and declared by Obligee to be in default under the subcontract, the Obligee having performed Obligee's obligations thereunder:
(1) Surety may promptly remedy the default, subject to the provisions of paragraph 3 herein, or;
(2) Obligee after reasonable notice to Surety may, or Surety upon demand of Obligee may arrange for the performance of Principal's obligation under the subcontract subject to the provisions of paragraph 3 herein;
. . . .
Colorado Structures, Inc. v. Ins. Co. of the W., 125 Wash.App. 907, 911-12, 106 P.3d 815 (2005) (emphasis added) (quoting Clerk's Papers (CP) at 82 (subcontract performance bond)). The majority states, "`[b]y its plain terms, Paragraph A of the bond makes [West] immediately liable to [Structures]'" and "`[b]y its plain terms, Paragraph B conditions the liability created by Paragraph A on oneand only oneexpress condition subsequent [that the principal promptly and faithfully perform].'" Majority at 1131-32 (same alterations in original) (quoting Colorado Structures, 125 Wash.App. at 917-18, 106 P.3d 815 (quoting CP at 82 (subcontract performance bond))). Therefore, reasons the majority, "`[r]ead together, Paragraphs A and B state that the surety's obligation commences when it executes the bond and continues until the principal promptly and faithfully performs.'" Id. at 1132 (quoting id. at 918, 106 P.3d 815).
¶ 42 But such an interpretation is inaccurate. Paragraph B simply states the duration of the bond; it does not obligate the surety to perform any act or to make any payment. As Amicus Surety Association of America correctly stated:
The fact that the bond continued in effect did not mean that performance was immediately due from the surety. The day the bond was signed and delivered to CSI, ICW was "held and firmly bound" to CSI and the bond was in effect, but ICW was not indebted to CSI, and CSI could not have demanded payment of $472,290 or any other amount.
Br. of Amicus Curiae Surety Ass'n of Am. at 5.
¶ 43 The majority goes on to state, "`Paragraph C . . . provides for certain remedies and measures of damage.'" Majority at 1132 (quoting Colorado Structures, 125 Wash.App. at 918, 106 P.3d 815 (quoting CP at 82 (subcontract performance bond))). But Paragraph C simply confirms West's obligation to act on the bond is triggered only after Structures formally declares default. See L & A Contracting Co., 17 F.3d at 111 ("After a *1145 declaration of default, the relationship changes dramatically, and the surety owes immediate duties to the obligee."). In other words, once Action materially breached the contract, Structures had an obligation to declare default, and after such declaration, one of three courses of actions would ensue: (1) West could promptly remedy the default, or (2) after reasonable notice to West, Structures could arrange for completion of the project, or (3) upon demand by Structures, West could arrange for completion of the project.
¶ 44 Instead of declaring Action in default, Structures notified West that Action was behind schedule and arranged for performance of the subcontract by supplementing Action's crews.[1] But under the plain language of the contract, supplementing Action's crews was only a viable course of action after default was declared[2] ("`Whenever Principal shall be, and declared by Obligee to be in default . . ., Obligee after reasonable notice to Surety may . . . arrange for the performance of Principal's obligation under the'" (quoting Colorado Structures, 125 Wash.App. at 912, 106 P.3d 815 (quoting CP at 82 (subcontract performance bond)))).
¶ 45 Further, holding West's liability on the bond is not conditioned on a declaration of default, deprives the surety of its contractual right to either "complete the contract or, at least, to participate in the selection of a contractor to properly complete the work." LAWRENCE R. MOELMANN & JOHN T. HARRIS, THE LAW OF PERFORMANCE BONDS 209 (1999). See also Balfour Beatty Constr., 986 F.Supp. at 86 ("[P]laintiff in the present case allowed [the principal] to complete the project, thereby denying the defendant the opportunity to exercise any of its options under the performance bond."); Elm Haven Constr., 376 F.3d at 101 (obligee's decision to hire a replacement contractor, which denied surety "the opportunity to complete the project itself or hire others to do so," discharged surety of its obligations).[3]
¶ 46 The majority, like the trial court, incorrectly emphasizes West's lack of involvement in negotiations between Structures and Action. See majority at 1128 ("West refused to participate in discussions regarding Action's performance or to comment on Structures' chosen remedy."); see also CP at 661, 662-63 (Findings of Fact and Conclusions of Law 13, 15) ("ICW had sufficient notice of problems with Action's performance . . . to cause a reasonable surety to investigate its potential liability" and "chose to take no action to investigate nor to protect its own interests."). Sureties are not explicitly required to monitor the progress of their principals under performance bonds.[4] In fact, prior to a declaration of default, a surety generally does not have a unilateral right to be involved in the project and may not interfere or meddle in the affairs of its principal. 2 CUSHMAN & MYERS, supra, § 34.04[B] & n. 5, at 1279-80 (citing Granite Computer Leasing Corp. v. Travelers Indem. Co., 894 F.2d 547 (2d Cir.1989)). And interfering with a principal's business before a declaration of default may subject the surety to claims of tortious interference.[5]Id. at 1280 (citing Gerstner Elec., Inc. v. Am. Ins. Co., 520 F.2d 790 (8th Cir.1975)). Consequently, a surety becomes involved in a construction project only after the obligee issues a declaration of default. Id.
¶ 47 As to the second issue, I agree with the majority that Olympic Steamship[[6]] applies *1146 to surety bonds and I would reward attorney fees to a prevailing contractor.
¶ 48 Accordingly, I dissent.
MADSEN, J. (concurring in the dissent).
¶ 49 I agree with the majority that there is no language in the performance bond that requires Colorado Structures, Inc. (Structures) to "formally" declare a default or terminate the subcontract as a condition precedent to Insurance Company of the West's (West) liability under the bond. But I disagree with the majority's holding that Structures had no legal obligation to declare a default at all. The majority dispenses with the declaration of default requirement after erroneously equating it with termination of the subcontract. In doing so, the majority renders superfluous key operative language of the performance bond. In my view, a declaration of default means notification that the principal is in breach of its contractual obligations. Such notice gives effect to the surety's contractual right to intervene, complete the work, and minimize its liability for damages. I concur in the result on the issue of liability because I agree with the majority that Structures adequately notified West that Action Excavating and Paving, Inc. (Action) defaulted on its contractual obligations.[1] Moreover, under well-established Washington law, even inadequate notice of the principal's default relieves a surety of liability only to the extent of any resulting prejudice. Accordingly, I concur on the issue of liability.
¶ 50 As to the attorney fees, however, I dissent from the majority's extension of Olympic Steamship Co. v. Centennial Insurance Co., 117 Wash.2d 37, 811 P.2d 673 (1991) to construction performance bonds. I agree with Chief Justice Alexander that there has been no showing that such contracts are "`substantially different from other commercial contracts'" so as to justify a departure from the American rule on attorney fees. Dissent (Alexander, C.J.) at 1142 (quoting Olympic S.S., 117 Wash.2d at 52, 811 P.2d 673). The extension of Olympic Steamship to construction performance bonds is inappropriate in view of the purpose and nature of the relationship created by a surety agreement, which is fundamentally different from a casualty insurance policy.

Declaration of Default
¶ 51 Performance bonds are a staple of the construction industry. One of the most commonly used forms of performance bonds is the American Institute of Architects' (AIA) Form A311, which has been in use since 1958. Robert F. Cushman, Surety Bonds on Public and Private Construction Projects, 46 A.B.A.J. 649, 651 (1960). The A311 bond guarantees that the principal "shall promptly and faithfully perform" the contract, which is incorporated by reference. Suppl. Br. of Pet'r Ins. Co. of the W. (App.A). A surety's performance obligations under the bond arise when (a) the principal (in this case, Action) defaults on its contractual obligations, (b) the obligee (Structures) declares a default, and (c) the obligee is not in default. When these three conditions occur, a surety has several options: it may remedy the default by, for example, financing the principal; complete the contract itself by arranging for another contractor to perform the principal's obligations; or simply pay the obligee its damages, i.e., the costs of completion. United States Fid. & Guar. Co. v. Braspetro Oil Servs. Co., 369 F.3d 34, 66 (2d Cir.2004) (quoting Granite Computer Leasing Corp. v. Travelers Indem. Co., 894 F.2d 547, 551 (2d Cir.1990)). If the completion costs exceed the unpaid contract balance, the surety must pay the difference, up to the penal amount of the bond. The bond at issue in this case is an A311 bond.
¶ 52 Both parties recognize that the key operative language of the bond is:
Whenever Principal shall be, and declared by Obligee to be in default under the subcontract, the Obligee having performed Obligee's obligations thereunder:

*1147 (1) Surety may promptly remedy the default . . ., or;
(2) Obligee after reasonable notice to Surety may, or Surety upon demand of Obligee may arrange for the performance of Principal's obligation under the subcontract . . . ;
(3) The balance of the subcontract price, as defined below, shall be credited against the reasonable cost of completing performance of the subcontract.
Clerk's Papers (CP) at 602.
¶ 53 The central dispute in this case is whether Structures "declared" Action "to be in default," thus triggering the surety's duty to perform its obligations under the subcontract. The surety contends that a declaration of default means termination of the subcontract. Structures argues that a declaration of default means notice that the principal is in material breach of the subcontract. The majority mistakenly adopts the surety's interpretation, recognizes that the bond does not condition a surety's liability on termination of the subcontract, and infers that the entire paragraph applies only when an obligee elects to terminate the subcontract. Since Structures did not terminate the principal's right to complete the subcontract in this case, the majority concludes that the provisions in question are inapplicable. The majority thus fails to give effect to what is widely understoodnot only by the parties here but in the construction industry generallyto be a central provision of the performance bond.
¶ 54 Under the performance bond, the principal and surety are "jointly and severally" liable for the principal's failure to "promptly and faithfully perform" the subcontract. CP at 602. Thus, the liability of the surety is coextensive with that of the principal. However, the surety's liability for damages is limited by the terms of the bond. In this case, the bond restricts the surety's liability for damages in two respects. First, the surety is liable up to the penal amount of the bond. Second, the surety may either cure the default itself, complete performance or pay the obligee for the costs of completion, depending on which option it deems most favorable to its interests. Under the majority's interpretation, an obligee may elect never to declare a default, thus depriving a surety of its contractual right to intervene and minimize its liability for damages.
¶ 55 In my view, the surety's contractual right to remedy a default obligates the obligee to declare a default so that the surety may decide whether to take action in order to minimize its damages. See Plowden & Roberts, Inc. v. Conway, 192 So.2d 528 (Fla. Dist.Ct.App.1966) (surety's right to complete performance under the AIA A311 performance bond is an affirmative defense, entitling surety to reduction in damage award to the extent of prejudice resulting from lack of notice); accord Blackhawk Heating & Plumbing Co. v. Seaboard Sur. Co., 534 F.Supp. 309 (N.D.Ill.1982); see also Arthur Adelbert Stearns, The Law of Suretyship § 239 (4th ed.1934) (a surety's liability may be offset by any damages resulting from the creditor's failure to notify it of the principal's default).
¶ 56 The majority incorrectly equates a declaration of default with a declaration of intent to terminate:
"If a principal is "in default under the subcontract" when he or she has materially breached the subcontract, thereby permitting but not requiring the obligee to terminate the subcontract, an obligee "declares" a principal to be in default when, having elected to treat the breach as "material," the obligee announces his or her intent to terminate the subcontract."
Majority at 1132-33 (quoting Colo. Structures, Inc. v. Ins. Co. of the West, 125 Wash. App. 907, 920, 106 P.3d 815 (2005)).
¶ 57 Contrary to the majority's assertion, it does not logically follow that a declaration of default is a declaration of intent to terminate. A declaration of default is no more than notice that the obligor is in breach of the contract.
¶ 58 The performance bond does not define "default" or set forth a procedure for declaring a default. Although the performance bond does not define "default", the subcontract, which is incorporated by reference, expressly provides that a default occurs when the subcontractor fails to perform the work *1148 in an efficient and skillful manner, fails to use enough properly skilled workers and supervision, fails to use proper materials and equipment and/or fails to carry on the work in a manner acceptable to the contractor, among other acts or inactions. CP at 605.[2]
¶ 59 The parties do not dispute that the principal here defaulted on its contractual obligations. The record amply demonstrates that Structures notified the surety of the principal's contract breaches through numerous oral and written communications. This satisfies the performance bond's declaration of default requirement.
¶ 60 The genesis of the majority's error appears to be its reliance on L & A Contracting Co. v. Southern Concrete Services, Inc., 17 F.3d 106 (5th Cir.1994). In L & A, the court effectively rewrote the language of the bond at issue, also a form A311 bond. In L & A, the bond claimant argued that "declared in default" means any communication that "`[made] it clear that [the principal] failed to fulfill a contract or duty.'" Id. at 110 (first alteration in original) (quoting Webster's Ninth New Collegiate Dictionary). The L & A court disagreed, holding that the phrase unambiguously means a "clear, direct, and unequivocal" declaration that the principal has committed a material breach, that the obligee regards the subcontract as terminated, and that "the surety must immediately commence performing under the terms of its bond." L & A, 17 F.3d at 111. The L & A court gave three reasons for rejecting the claimant's contrary interpretation of default.
¶ 61 First, the court stated that in construction suretyship law, "default" has a particular meaning, i.e., "a (1) material breach or series of material breaches (2) of such magnitude that the obligee is justified in terminating the contract." Id. at 110. In the court's view, the claimant's definition "impermissibly blurs the distinct concepts of `breach' and `default.'" Id. at 110. In support, the court cites a law review article by James A. Knox entitled, What Constitutes a Default Sufficient to Justify Termination of the Contract: The Surety's Perspective, Constr. Law (Summer 1981), which discusses the "confusion" that results when "`the obligee claims default but does not terminate and yet demands action by the surety.'" Id. at 110 n. 11 (emphasis omitted) (quoting Knox, supra, at 1).
¶ 62 Second, the court considered it "impractical" and "commercially absurd" to define a "declaration of default" as something less than express, unequivocal declaration that the surety must immediately begin performance because sureties face tort liability for prematurely interfering in the principal's affairs and "would be reluctant to enter into otherwise profitable contracts" without a "clear rule for notices of default." Id. at 111.
¶ 63 Third, the L & A court considered that an express declaration of default is necessary to fulfill the purpose of the notice of default provision, which is to avoid the common law rule that a surety is not entitled to notice when the time for its performance is due.
¶ 64 Because the obligee did not satisfy the "clear rule" announced by the L & A court, the surety was discharged from any liability under the performance bond.
¶ 65 L & A's reasoning is deeply flawed and should be soundly rejected by this court. First, L & A erred in reasoning that "default" must mean a material breach justifying termination rather than the failure to fulfill a contractual obligation. The subcontract itself defines "default," and the meaning of "default" must also be read in light of the purpose of the bond, which is to guarantee the "prompt and faithful" performance of the subcontract. Obviously, a subcontract has not been promptly and faithfully performed when the principal has breached its contractual obligations, whether the breach is serious enough to justify termination or not. "[I]t is axiomatic that the very purpose of a performance bond is `to assure completion of the contract.'" United States Fid. & Guar. *1149 Co., 369 F.3d at 67 (holding that a surety must pay all the costs of completion, not simply those incurred after a declaration of default) (quoting Pearlman v. Reliance Ins. Co., 371 U.S. 132, 140, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962)); see also Surety Information Office, The Information Source on Surety Bonds in Construction, http://www. sio.org/private/fprivate1.html (last visited July 31, 2007) (A performance bond "protect[s] the owner from financial loss should the contractor fail to perform the contract in accordance with its terms and conditions.").
¶ 66 Moreover, it is not the role of the court to rewrite the bond language to save a surety from any "confusion" that may result when its obligations are uncertain. See Joint Admin. Bd. of Plumbing & Pipefitting Indus. v. Fallon, 89 Wash.2d 90, 94, 569 P.2d 1144 (1977) ("if the language of the bond is ambiguous, the bond is construed in favor of liability of the surety"). Nothing in the form A311 bond requires an obligee to terminate a subcontract as a condition precedent to the surety's performance obligations. Am-Haul Carting, Inc. v. Contractors Cas. & Sur. Co., 33 F.Supp.2d 235, 242 (S.D.N.Y.1998) (declaration of default, not termination of the subcontract, triggers a surety's obligations under a performance bond). Rather, the bond permits an obligee to allow a principal to continue performing following breach rather than terminating the subcontract. In such circumstances, the surety may step in and take any of a number of actions, such as financing the principal or otherwise facilitating its performance, and it may do so under a reservation of rights if there is a legitimate dispute as to whether the principal is in default. A surety that wishes to avoid any "confusion" arising when an obligee does not follow through and terminate a subcontract following a declaration of default may elect to use form A312, which unlike form A311, expressly conditions a surety's performance obligations on the termination of the subcontractor's right to complete the contract. Am. Bar Ass'n (ABA), Bond Default Manual 185 (1987) (Ex. 5.4, ¶ 12.3).
¶ 67 The L & A court is also incorrect in stating that a "clear rule" is necessary to save a surety from tort liability for interference with the principal's business relationship. There is no basis for the court's statement. Once a surety has notice of a potential claim, it is privileged to intervene and protect its interests without liability for tortious interference. Gerstner Elec., Inc. v. Am. Ins. Co., 520 F.2d 790, 794-95 (8th Cir. 1975) (holding that a surety, after becoming aware of a single claim for labor and materials by a subcontractor, acted reasonably by directing the owner to withhold further payments from the contractor even though contractor had not been declared in default by the owner); Zoby v. Am. Fid. Co., 242 F.2d 76, 79 (4th Cir.1957) ("Where the alleged interferer is a financially interested party, and such interest motivates its conduct, it cannot be said that [the interferer] is an officious or malicious meddler," finding no actionable interference where surety recommended to the obligee that it complete the contract with another contractor.). Here, the language of the performance bond itself provides that a surety "may promptly remedy the default" upon a declaration of default, authorizing the surety's interference in the principal's affairs. CP at 602. Moreover, the indemnity agreement between the principal and surety gives the surety "the right, at its option and in its sole discretion . . . to take possession of all or any part of the work under the contract covered by the Bonds and to complete or arrange for the completion of the same" in the event of the principal's default, which the agreement defines as "any . . . breach of or refusal or inability to perform" the bonded contract. CP at 305, 304 (emphasis added). A surety need not wait until the obligee has actually terminated the contract before intervening. Rather, the surety has an express contractual right to cure a default before it results in termination of the subcontract.
¶ 68 Finally, the essential purpose of the notice requirement is to give effect to the surety's contractual right to intervene and minimize its liability for damages. This purpose is well served by interpreting "declared in default" as notice of the principal's breach of its contractual obligations. It is less well served by equating declaration of default with termination of the subcontract because a surety may have no opportunity to intervene *1150 and cure a default before it results in a more costly termination.
¶ 69 L & A's holding that the failure to declare a default discharges a surety's liability is also inconsistent with the well-established law of this state. A contract of suretyship is construed in accordance with the laws of the State. Ramsey & G. Constr. Co. v. Vincennes Bridge Co., 283 U.S. 796, 51 S.Ct. 484, 75 L.Ed. 1420 (1931). The surety's representation that L & A is "settled law" is wishful thinking, at best. There has long been a "strong divergence of opinion" as to whether the failure to comply with a notice requirement when a bond expressly conditions liability on notice discharges a surety's liability. S. Sur. Co. v. MacMillan Co., 58 F.2d 541, 545 (10th Cir.1932). One line of cases strictly enforces such express notice requirements while another line of cases holds that violation of a notice requirement exonerates a surety only to the extent of resulting prejudice even when notice is an express condition precedent to liability under the performance bond. Id. at 545. Washington courts have consistently followed the latter rule. Cmty. Bldg. Co. v. Ma. Cas. Co., 8 F.2d 678 (9th Cir.1925) (collecting Washington cases). See, e.g., Lazelle v. Empire State Sur. Co., 58 Wash. 589, 109 P. 195 (1910) ("the surety cannot complain when it can show no loss or substantial damage by reason of the failure to receive notice, in the exact and technical language of the contract, or make it appear that its failure to receive notice has prevented it from taking proper steps for its protection."); Denny v. Spurr, 38 Wash. 347, 352, 80 P. 541 (1905) (a compensated surety "can insist only on those forfeiture clauses of its contract the failure to comply with which probably inflicts upon it a loss."); Heffernan v. United States Fid. & Guar. Co., 37 Wash. 477, 481, 79 P. 1095 (1905) ("yet when the notice serves its purpose as well when given after the prescribed time as it does beforethat is, when it is equally effective in protecting the surety from lossit is inequitable, and a manifest abuse of the purposes of this provision of the bond, to hold that the mere technical variance shall relieve the obligor entirely"). Thus, while L & A may reflect Florida law, it is inconsistent with well-established Washington precedents.
¶ 70 Although the majority correctly rejects the central holding of L & A, it errs in adopting its interpretation of "declaration of default" as a declaration of intent to terminate the subcontract. Contrary to L & A, "declared in default" is not unambiguous and, thus, should be interpreted in favor of liability of the insured. Here, the numerous oral and written communications notifying the surety that the principal had defaulted on its contractual obligations, giving rise to a potential claim, satisfied the declaration of default requirement. In adopting a narrow definition of "declared in default," the majority repeats the error it recognizes elsewhere in L & A of failing to give effect to the language of the bond in light of recognized principles of contract interpretation as applied to suretyship. The result is that the majority renders inoperative a key provision defining the surety's contractual rights and obligations, including the right to receive notice of the principal's default so that it may intervene and minimize its liability for damages.

Olympic Steamship Attorney Fees
¶ 71 In extending Olympic Steamship to construction performance bonds, the majority fails to account for the critical differences between suretyship and insurance. Olympic Steamship fees are an equitable remedy, based on "the special fiduciary relationship . . . existing between an insurer and insured." McGreevy v. Or. Mut. Ins. Co., 128 Wash.2d 26, 36, 904 P.2d 731 (1995). Accordingly, an insured has an "enhanced duty" to the insured which prevents it from putting its own interests before that of the insured's. The fiduciary nature of the relationship arises from the disparity in bargaining power that generally exists between an insurer and insured, and the insured's unique vulnerability when faced with a casualty loss. McGreevy, 128 Wash.2d at 36, 904 P.2d 731 (quoting Tank v. State Farm Fire & Cas. Co., 105 Wash.2d 381, 385-86, 715 P.2d 1133 (1986)). Neither characteristic is present in the relationship between a surety and obligee. In fact, imposing fiduciary obligations *1151 on a surety is fundamentally inconsistent with the nature and purpose of a suretyship agreement, as recognized by statute and common law.
¶ 72 I agree with Chief Justice Alexander that this court should not assume that the disparity of bargaining power characteristic of typical consumer insurance contracts exists in the context of construction suretyship. As discussed by the California Supreme Court in Cates Construction, Inc. v. Talbot Partners, 21 Cal.4th 28, 980 P.2d 407, 86 Cal.Rptr.2d 855 (1999), a disparity in bargaining power generally is absent in construction performance bonds, which are always entered into in a commercial setting.
¶ 73 In dismissing the thorough, well-reasoned analysis of the differences between performance bonds and insurance contracts set forth in Cates, the majority states that the decision does not address attorney fees, represents a minority position, and rests on a different statutory scheme.
¶ 74 The majority is correct that the primary issue in Cates is whether a surety may be liable in tort for damages resulting from a bad faith breach of contract, not whether a surety may be liable for attorney fees. The court addressed whether a surety agreement is sufficiently akin to an insurance policy to justify tort liability for a bad faith breach of contract, notwithstanding the general rule limiting a claimant to contractual damages. Here, the issue is whether a surety agreement is sufficiently akin to insurance to justify an exception to the American rule, requiring each party to bear its own litigation expenses. Both issues turn on whether there is a fiduciary or quasi-fiduciary relationship between the parties, and whether public policy compels an exception to the general rule.
¶ 75 Contrary to the majority, most courts addressing the issue have recognized that the obligee on a performance bond, the owner of a construction project, is not similar to an individual insured in terms of bargaining power and sophistication. See, e.g., Masterclean, Inc. v. Star Ins. Co., 347 S.C. 405, 556 S.E.2d 371, 375 (2001) ("Inequities in bargaining power are largely absent in the surety context because the obligee, not the surety, usually dictates the bond requirements."); Blackfeet Tribe of Blackfeet Indian Reservation v. Blaze Constr., Inc., 108 F.Supp.2d 1122, 1142 (D.Mont.2000) (finding that the parties were not in inherently unequal bargaining positions); Cates, 21 Cal.4th at 53, 86 Cal.Rptr.2d 855, 980 P.2d 407 (concluding that "[p]erformance . . . bonds do not reflect the . . . unequal bargaining power that [is] inherent in insurance policies"); Great Am. Ins. Co. v. Gen. Builders, Inc., 113 Nev. 346, 355, 934 P.2d 257 (1997) (no inherent inequality in bargaining power between a performance bond obligee and a surety); Transamerica Premier Ins. Co. v. Brighton Sch. Dist. 27J, 940 P.2d 348, 353 (Colo.1997) (admitting that the parties to a suretyship contract are on "equal footing" when entering into the agreement); Great Am. Ins. Co. v. N. Austin Mun. Util. Dist. No. 1, 908 S.W.2d 415, 418 (Tex.1995) (noting that it is the obligee, not the surety, that controls the form of the bond and the terms of the incorporated contract).
¶ 76 These courts acknowledge that, unlike in the case of casualty insurance, in which a consumer accepts insurance on a "take it or leave it" basis, the obligee has the power to dictate the terms of the bond. As the California Supreme Court observed:
If the obligee does not agree with the terms of the bond secured by the principal, it may consent to a modification of the underlying contract or may end bargaining altogether and seek a different principal whose financial resources and qualifications enable it to procure a bond with acceptable terms. (See generally, [Randall S. Udelman] Comment, Surety Contractors: Are Sureties Becoming General Liability Insurers? (1990) 22 Ariz. St. L.J. 469, 484.) Hence, obligees generally possess ample bargaining power to negotiate for favorable bond terms.
Cates, 21 Cal.4th at 52, 86 Cal.Rptr.2d 855, 980 P.2d 407.
¶ 77 In the majority's view, the California court's reasoning is belied by the use of form contracts in construction suretyship, which is a "convincing reason" to infer a disparity in bargaining power between sureties and obligees. *1152 Yet, as the majority notes, the form bonds are drafted by an uninterested third party, the American Institute of Architects. Even more importantly, the obligee, not the surety, controls the terms and conditions of the bonded contract. Indeed, the surety has no input into the terms and conditions of the bonded contract, which defines the nature and extent of its performance obligations. See Great Am. Ins. Co., 908 S.W.2d at 415 (noting that surety has no control over the contract documents that define its liability). Thus, a performance bond does not involve the elements of adhesion and inequality of bargaining power characteristic of a typical insurance policy.
¶ 78 Moreover, a surety's nonperformance does not raise the same public policy concerns implicated when an insurance company fails to compensate a policyholder for losses covered by a casualty insurance policy. An obligee faced with the default of its subcontractor is not in the uniquely dependent or vulnerable situation of an insured that has experienced an unforeseen calamity. The majority likens a construction performance bond to a fire insurance policy that promises immediate cash for food, shelter and clothing, or disability insurance that replaces a lost income stream. However, the purpose of a performance bond is not to protect an obligee from potential property damage or other unforeseen losses. And unlike in the case of a typical consumer insurance claim, an obligee does not depend on a prompt pay-out to satisfy basic necessities of life. Rather, an obligee relies on the surety for additional security to ensure the fulfillment of a commercial contract. A surety's breach "threatens to create no different a dilemma than that posed by the principal's default on the underlying construction contract." Cates, 21 Cal.4th at 55, 86 Cal.Rptr.2d 855, 980 P.2d 407.
¶ 79 The majority overstates an obligee's reliance on a surety's prompt payment of a claim. Other courts have noted that an obligee, unlike the victim of an unforeseen calamity, can "cover" its losses when faced with the surety's nonperformance. Cates, 21 Cal.4th at 53, 86 Cal.Rptr.2d 855, 980 P.2d 407. While an insured can look only to the insurer for help, an obligee on a surety bond has recourse against the principal as well as the surety, including all available contractual remedies. Upon the principal's default, the obligee may withhold the balance of the contract price and hire another contractor to perform the work if the surety refuses to do so. The facts of this case belie the majority's assertion that the primary benefit of a performance bond is lost when the surety forces an obligee to litigate the issue of coverage. The obligee completed the project and then successfully sued the surety for damages, winning an award for the full penal amount of the bond. The obligee thus gained the principal benefit of the performance bond: compensation for its contractual damages notwithstanding the subcontractor's financial insolvency.
¶ 80 The purpose of a construction performance bond is different from the purpose of a casualty insurance policy. An obligee does not obtain a performance bond to avoid litigation with the principal or to guarantee "immediate liquid resources to weather the effects of an emergency." Majority at 1139. A performance bond protects the obligee from financial losses resulting from the principal's failure to fulfill its contractual obligations. The surety lends its credit to guarantee payment in the event the principal defaults on its contract: the obligee relies on the performance bond as additional financial security to protect itself from financial loss in the event of the principal's financial insolvency. A surety may provide an immediate infusion of cash to prevent a more costly default, but it is generally not contractually required to do so. On the contrary, a surety usually may elect to "do nothing," leave completion of the contract to the obligee, and then compensate the obligee for its damages. See article by Patrick E. Hartingan & Andrew J. Ruck, Completion of Contract by the Owner, in ABA, Bond Default Manual, supra, at 159-60. Unlike a typical claim on a casualty insurance policy, a performance bond claim is essentially a claim for contractual damages.
¶ 81 As recognized by the United States Supreme Court, a performance bond claim involves "plain and simple commercial litigation." *1153 F.D. Rich Co. v. United States, 417 U.S. 116, 130, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974). Accordingly, in F.D. Rich Co., the Court held that attorney fees may not generally be awarded to successful claimants on the surety bonds required of government contractors under 40 U.S.C. §§ 207a-270e (the "Miller Act"), which protects those who supply labor and materials to a contractor on a federal project. The Supreme Court rejected the argument that a claimant would not be made whole absent an attorney fee award, noting that the argument "merely restates one of the oft-repeated criticisms of the American Rule." F.D. Rich, Co., 417 U.S. at 128, 94 S.Ct. 2157. The Court observed that under a well-established exception to the American rule, "attorneys' fees may be awarded to a successful party when his opponent has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." Id. at 129, 94 S.Ct. 2157. Absent an applicable exception, however, the Court held that the American rule should govern surety bond claims:
Miller Act suits are plain and simple commercial litigation. In effect then, we are being asked to go the last mile in this case, to judicially obviate the American Rule in the context of everyday commercial litigation, where the policies which underlie the limited judicially created departures from the rule are inapplicable. This we are unprepared to do. The perspectives of the profession, the consumers of legal services, and other interested groups should be weighed in any decision to substantially undercut the application of the American Rule in such litigation.
Id. at 130-31, 94 S.Ct. 2157.
¶ 82 The majority improvidently overrides the "prevailing system of contractual attorney fee provisions in construction contracts," which we recently acknowledged in Cosmopolitan Engineering Group, Inc. v. Ondeo Degremont, Inc., 159 Wash.2d 292, 303, 149 P.3d 666 (2006). There, we concluded that the legislature did not intend to supplant the American rule or contractual attorney fee provisions when it authorized the recovery of attorney fees by successful claimants on the surety bond required of registered contractors. We held that the statutory attorney fee provision authorizes an award of attorney fees only against the surety, not the contractor, and only up to the penal amount of the bond. We noted that "countervailing considerations" support limiting attorney fee awards to the penal amount of the bond, such as the availability and cost of surety bonds. Cosmopolitan Eng'g, 159 Wash.2d at 304-05, 149 P.3d 666. We also observed that "[p]arties to a construction contract can, and often do, include an attorney fee provision in their contracts." Id. at 303, 149 P.3d 666. Indeed, in this case, the subcontract expressly provides for attorney fees, a fact which the majority ignores.[3] In assuming the risk of the principal's default, the surety agreed that it would be liable for attorney fees arising from the costs of litigation, but only up to the penal amount of the bond. The majority offers no persuasive reason for supplanting the American rule or the parties' contract and fails to take into account the likely adverse consequences on the cost and availability of performance bonds.
¶ 83 The majority states that absent liability for attorney fees, a surety lacks sufficient incentive to fulfill its contractual obligations. In support, the majority quotes the dissenting justice's view in Cates that the value of a performance bond is "`deeply undermined if sureties can regularly choose to ignore their obligations.'" Majority at 1138 n. 13. The dissent observed that the purpose of a bond is to ensure "`timely, dependable performance of the construction contract,'" and the obligee "`depend[s] upon the surety's good faith performance of these duties.'" Id. (quoting Cates, 21 Cal.4th at 65-66, 86 Cal. Rptr.2d 855, 980 P.2d 407 (Mosk, J., dissenting)). As the majority elsewhere observes, however, Cates involves the availability of tort damages for a surety's bad faith breach of contract. Thus, Justice Mosk's remarks *1154 presume the existence of bad faith, which in itself would be sufficient to support an award of attorney fees under existing law. See McGreevy, 128 Wash.2d at 37, 904 P.2d 731 (noting that "the existence of bad faith alone would support the invocation of the court's equitable powers to award attorney fees"). The majority's broad new extension of Olympic Steamship is unwarranted because a surety already risks liability for attorney fees with a bad faith refusal to pay.
¶ 84 Given that neither the disparity in bargaining power nor the unique vulnerability of the insured characteristic of a typical consumer insurance contract is present in the commercial context of a construction performance bond, the rationale supporting Olympic Steamship does not apply. In fact, imposing an "enhanced duty" on sureties is fundamentally inconsistent with the conditional nature of the surety's obligation, as well as the surety's competing duties to the principal as recognized by both statutory and common law.
¶ 85 As noted by the majority, we awarded Olympic Steamship attorney fees to a successful claimant on a fidelity bond in Estate of Jordan v. Hartford Accident & Indemnity Co., 120 Wash.2d 490, 844 P.2d 403 (1993). However, we did so without examining the differences between fidelity bonds and other forms of insurance because the issue was not before us. In McGreevy, we recognized that there are "essential differences between a fidelity bond and various insurance coverages," while concluding that fidelity bonds fall within the scope of insurance contracts covered by Olympic Steamship. McGreevy, 128 Wash.2d at 33, 904 P.2d 731. Indeed, it is generally recognized that fidelity bonds, which indemnify employers for financial losses resulting from the dishonest or fraudulent acts of an employee, resemble a traditional contract of insurance. Cates, 21 Cal.4th at 46, 86 Cal.Rptr.2d 855, 980 P.2d 407.
¶ 86 The majority discerns no material distinction between fidelity bonds and surety bonds. However, a fidelity bond is a two-party contract while a surety bond is a three-party contract. The materiality of this distinction is that in the one-on-one relationship created by a fidelity bond, the insurer owes a duty only to the obligee, not to the third party whose actions give rise to a claim. In contrast, in a surety relationship, a surety owes competing duties to the obligee and the principal, arising from the fact that the principal is the primary obligor on the bond and must indemnify the surety for any damages it pays on the principal's behalf.
¶ 87 In the one-on-one relationship created by a fidelity bond, it is appropriate to impose an "enhanced duty" on the insurer in view of its undivided duty of loyalty to the obligee. McGreevy, 128 Wash.2d at 36, 904 P.2d 731 (an insurer's "enhanced duty" precludes it from putting its own financial interests before that of the insured). But such an "enhanced duty" is fundamentally inconsistent with the role of a surety, who stands in the shoes of its principal and may assert any defense that the principal has against the obligee. See Stearns, supra, § 102. In a surety agreement, the rights, remedies and defenses of a surety cannot be disassociated from those of the principal. When a surety contests its liability, it is protecting not only its own interests but those of the principal. In fact, by statute a surety is barred from submitting to a default judgment when notified that the principal has "a valid defense." RCW 19.72.090. And a surety may forfeit its right to indemnification by prejudicing any defenses the principal may have against the obligee or by making payments when the principal is not liable. See Restatement of Security § 108(5) (1941); Stearns, supra, § 284. Imposing an "enhanced duty" on the surety toward the obligee is inconsistent with the surety's statutory and common law obligations to the principal.
¶ 88 To the extent that the policy of Olympic Steamship is to encourage the prompt payment of claims, its application to suretyship contravenes a surety's statutory right to require the bond obligee to look to the principal before holding the surety liable. In recognition of the conditional nature of the surety's obligation, RCW 19.72.100 allows a surety to require a bond obligee to sue the principal on the contract before the surety is liable, while RCW 19.72.101 discharges a surety of liability if the bond obligee fails to proceed against the principal in a timely *1155 manner.[4]See Amick v. Baugh, 66 Wash.2d 298, 308, 402 P.2d 342 (1965) (explaining that RCW 19.72.100 and .101 codify the "Pain v. Packard" suretyship rule (13 Johns. R. 174 (N.Y.Sup.Ct.1816)), which allows a surety to convert itself into a guarantor of collection). The law applies equally to compensated and uncompensated sureties. RCW 19.72.900; RCW 48.28.050.[5]
¶ 89 The policy of discouraging a surety from contesting its liability is also inconsistent with the surety's contractual and equitable rights to indemnification, because if a surety pays a doubtful claim, it may forfeit its right to indemnification.
¶ 90 In view of the surety's divided loyalty to the obligee and the principal, the fiduciary or quasi-fiduciary relationship existing in the one-on-one relationship between insurer and insured in the context of casualty insurance, including a fidelity bond, does not exist between a surety and obligee. A surety's duty to the obligee is no greater than its duty to the principal. Because a surety has no "enhanced duty" toward the obligee, Olympic Steamship does not apply.
¶ 91 The extension of Olympic Steamship to surety contracts will have the inequitable effect of imposing liability for attorney fees on principals who would otherwise not be liable in the absence of a contractual attorney fee provision. This is because the surety has an implied (and usually, as here, an express) contractual right to indemnification for any costs it incurs as a result of the principal's default. Stearns, supra, § 280 (a surety has an implied contractual right to indemnification from principal for any payment made to the creditor). Applying Olympic Steamship fees to litigation arising from performance bond claims may be unjust to the principal, who must ultimately pay the attorney fees, yet has no control over the surety's decision to honor the claim.
¶ 92 The majority compounds its error by permitting an award of attorney fees against the surety in excess of the penal amount of the bond. The performance bond expressly limits the surety's liability to the penal amount: "in no event shall the aggregate liability of the Surety exceed the amount of this bond." CP at 602. Construing similar language, the California Supreme Court held that the penal amount caps the surety's liability for attorney fees as well as other damages. "`[U]nder the rule that a surety on a bond is not liable beyond the penalty named therein, the surety is not liable for attorney's fees in excess of the penalty named.'" Hartford Accident & Indem. Co. v. Indus. Accident Com., 216 Cal. 40, 50, 13 P.2d 699 (1932) (quoting 50 C.J.S. § 149, at 92); see also T & R Painting Constr., Inc. v. St. Paul Fire & Marine Ins. Co., 23 Cal.App.4th 738, 29 Cal. Rptr.2d 199, 203 (1994) (holding that obligee may recover attorney fees as provided in subcontract so long as total recovery does not exceed penal amount of the bond); Lawrence Tractor Co. v. Carlisle Ins. Co., 202 Cal.App.3d 949, 249 Cal.Rptr. 150, 153 (1988) (holding that recovery of attorney fees is limited to penal amount of the bond absent contractual provision to the contrary); In re Guardianship of Davison, 31 Wash.App. 480, 642 P.2d 1259 (1982) (noting that the general rule limits a surety's liability for attorney fees to penal sum of the bond); Basic Refractories v. Bright, 72 Nev. 183, 298 P.2d 810, 818 (1956) (holding that the obligee may recover attorney fees as an element of damages only up to the limit of the penal amount of the bond).
¶ 93 As the California Supreme Court observed,
The general rule has always been that plaintiff cannot recover more than the penalty of the bond. An attorney's fee is a part of the loss sustained by an obligee when compelled to sue on a bond. In other words, it partakes of the nature of the damages sustained, and the agreement to pay same makes it a part of such damages. But the bond does not provide for *1156 protection against damages beyond the amount of the penalty. As to such damages in excess of the penalty, the obligee must stand the loss himself or at least look elsewhere than to the surety.
Hartford Accident, 13 P.2d at 703 (citations omitted) (quoting Hartford Fire Ins. Co. v. Casey, 196 Mo.App. 291, 191 S.W. 1072, 1076 (1917)). Of course, in the case of a bad faith refusal to pay, a surety may be liable for attorney fees above the penal amount, as a penalty for its own misconduct, rather than as compensation for the principal's default. See United States ex rel. Yonker Constr. Co. v. W. Contracting Corp., 935 F.2d 936 (8th Cir.1991) (upholding award of attorney fees based on surety's bad faith breach of contract). Alternately, attorney fees above the penal amount may be appropriate when a statute expressly allows attorney fees for a surety's breach of the performance contract. See, e.g., Great Am. Ins., 908 S.W.2d at 427-28 (surety liable above the penal amount for its own contractual breach, under statute allowing attorney fees for successful claimants on a contract); David Boland, Inc. v. Trans Coastal Roofing Co., 851 So.2d 724, 727 (Fla. 2003) (surety liable for attorney fees in excess of penal amount under statute allowing recovery of attorney fees by successful claimant in action against insurers, including sureties). In the absence of a bad faith refusal to pay, however, the surety should not be penalized for exercising its statutory and common law right to vigorously contest liability.
¶ 94 Statutory surety bonds expressly limit a surety's liability to the penal amount of the bond, including liability for attorney fees. See Cosmopolitan Eng'g, 159 Wash.2d 292, 149 P.3d 666 (construing RCW 18.27.040, governing mandatory contractor's surety bond); Davison, 31 Wash.App. at 482, 642 P.2d 1259 (construing RCW 19.72.109, .180 as applied to guardianship surety bonds required under RCW 11.88.100). The majority gives no reason for providing more protection to the obligees of private surety bonds than exists for the obligees of statutory surety bonds, which protect ordinary consumers as well as particularly vulnerable individuals who have been entrusted to the care of a guardian.

Conclusion
¶ 95 I concur that West was not relieved of its liability on the performance bond by Structures' failure to terminate Action's right to complete the subcontract. The phrase "declared in default" required Structures to notify West that Action was in breach of its contractual obligations, but it did not require Structures to terminate the subcontract as a condition precedent to West's liability.
¶ 96 I dissent from the majority's holding that West is liable for Olympic Steamship attorney fees. Olympic Steamship fees are based on the special fiduciary relationship between an insurer and insured, which does not exist in the commercial context of construction suretyship. West's liability for attorney fees is governed by the American rule and by the contract, which in this case provides recovery of attorney fees up to the full penal amount of the bond.
I CONCUR: MARY E. FAIRHURST, J.
NOTES
[1] Structures entered into two subcontracts with Action. One for "offsite" work and one for "onsite" work. The "offsite" subcontract, which comprised the sewer work, is the contract at issue in this case. Ex. 2.
[2] A "performance bond" is "a surety bond guaranteeing the faithful performance of a contract." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1678 (2002).
[3] It is not clear from the record whether Structures was supplementing Action's crews before the August 23 meeting. For instance, in a letter addressed to Action on October 9, 1998, Structures stated that it "ha[d] been supplementing [Action's] work for over two months." Ex. 26. If read literally, that would mean Structures began supplementing Action's crews no later than August 9, 1998.
[4] West, during trial, stated that its surety manager did not attend the meeting because Action's attorney told him not to. The trial judge found this reason "puzzling." CP at 517.
[5] Approximately a month prior to Structures September 18, 1998 communication, an internal West e-mail written on or about August 27, 1998, concerning this construction project, referred to a "possible claim" against the bond.
[6] West's response appears to have been in line with its "zero loss underwriting policy." CP at 660.
[7] The parties stipulated during the early stages of the bench trial that Action was "in material breach of its off-site subcontract with [Structures] at some point prior to August 15th, 1998." Verbatim Report of Proceedings at 20-21.
[8] The trial court recognized that Olympic Steamship attorney fees did apply to surety bonds, but that in this case, "the evidence [did] not present a `coverage question.'" CP at 521.
[9] The trial court awarded Structures damages in the amount of $417,172 and $55,118 in attorney fees.
[10] The trial court ruled, as a matter of law, that "[Structures] was not required to use the express term `default' in its communications with [West] and [Structures'] failure to use that express term does not relieve [West] of liability to [Structures] under the Performance Bond." CP at 664.
[11] In the alternative, West argues in its supplemental briefing to this court that the Court of Appeals' reasoning is "intern[ally]inconsistent," when the court held that "[Structures] gave adequate notice [to West that Structures was having concerns with Action's performance]." Colorado Structures, 125 Wash.App. at 924, 106 P.3d 815. West contends, given the inclusion of the above language, that the Court of Appeals must have "believed that [West's] bond was conditioned on something other than Action's faithful performance . . . [specifically, adequate notice]." Suppl. Br. of Pet'r at 8. However, we find this contention unpersuasive, as the Court of Appeals was merely affirming an explicit finding made by the trial court, namely, that West was put on "adequate notice" by Structures of its concerns with Action's performance. Id. In other words, the Court of Appeals' holding with regard to the issue of notice had no bearing on its analysis of the language of the bond. Nor does it have any bearing on our analysis; although we agree with the trial court and the Court of Appeals that West was put on adequate notice of Structures' concerns regarding Action's performance.

In addition, West contends that Structures materially breached the terms of the subcontract when it supplemented Action's work, without giving Action (or West) 48-hour notice. This argument is without merit. First, the record is not at all clear with regard to the specific timing of Structures' supplementation. Second, we are not convinced that even if there was a breach of the 48-hour notice requirement, that it was anywhere near a material breach. In fact, there is clear evidence that: Action (and West) received written and verbal notice of Structures' concerns with regard to Action's performance and Structures' intent to "subsidize" Action's crews; Action also had concerns with its ability to complete its work as scheduled and welcomed Structures' supplementation; West had every opportunity to object to Structures' supplementation, but did not. Thus, these additional arguments are either without merit, irrelevant to the substantive issues before us, and/or outside the scope of the petition. RAP 13.7(b). Accordingly, we dismiss West's additional claims.
[12] The dissent ably distinguishes surety bonds from the fidelity bonds at issue in Estate of Jordan, but the distinction applies only to certain aspects of these bonds, not the disparate bargaining position nor the necessity of prompt payment. Fidelity bonds are indistinguishable from performance bonds with respect the relative bargaining position of the parties.
[13] The dissent in Cates aptly described the public policy implications of this dilemma:

In such a contract, whether or not titled "insurance policy," certainty is of the essence from the obligee-insured's point of view. The developer seeks a bond in order to be certain of timely, dependable performance of the construction contract. As this case demonstrates, the financial viability of the entire project may depend upon the surety's good faith performance of these duties.
As with any other form of insurance, the surety bond system allows one party to shift to another a contingent risk that the first party, the developer-obligee, cannot itself bear. The social good served by such contracts is the same served by other classes of insurance: greater freedom of activity by more participants than would be possible if each had to bear all the risks of its own enterprise.
Certainty of performance being the essential value of performance bonds, their worth is deeply undermined if sureties can regularly choose to ignore their obligations, having nothing to fear but contract damages that will approximate what they would pay in performance.
Cates, 21 Cal.4th at 65-66, 86 Cal.Rptr.2d 855, 980 P.2d 407 (Mosk, J., dissenting).
[14] The dissent suggests that because performance bonds do not provide resources "to satisfy basic necessities of life," they are distinct from insurance policies. Dissent at 1152. (Madsen, J., dissenting). We think that it is a distinction without a difference. First of all, not all insurance contracts provide for the basic necessities of life. Performance bonds and insurance contracts both depend on certainty of performance for their worth because prompt payment on each prevents a bad situation from becoming worse. Among the reasons we awarded attorney fees in Olympic Steamship was to "encourage the prompt payment of claims." Olympic S.S., 117 Wash.2d at 53, 811 P.2d 673 (citing Hayseeds, 352 S.E.2d at 79). The rationale implicit in Olympic Steamship applies with equal force to surety bonds.
[15] There is, however, one difference between insurance contracts and performance bonds that we did not consider in Estate of Jordan: the tripartite nature of the performance bond. We conclude this difference is immaterial. The dissent observes that "a surety owes competing duties to the obligee and the principal, arising from the fact that the principal is the primary obligor on the bond and must indemnify the surety for any damages it pays on the principal's behalf." Dissent at 1154 (Madsen, J., dissenting). Indemnity, however, is not a foregone conclusion. A surety who wrongfully pays an obligee may, as the dissent notes, "forfeit its right to indemnification." Id. at 1154. Thus, the dilemma facing the surety is not to balance its duty to the principal with its duty to the obligee. Rather, it must balance its duty to the oblige against its own self-interest. The surety must choose whether a principal has or has not defaulted and thus whether payment is owed the obligee. But the risk of a wrongful decision falls on the surety, not the principal. The dissent's concern that sureties will rush to make payments, fearing the attorney fee provision, has little impact on the principal. As the dissent notes, payment of a doubtful claim may forfeit the surety's right to indemnification. Thus, as with an insurance contract, the surety balances its own interest against that of the obligee.
[16] West then secured an indemnity agreement from Action to secure its interests.
[17] The dissent argues that Cosmopolitan Engineering Group, Inc. v. Ondeo Degremont, Inc., 159 Wash.2d 292, 149 P.3d 666 (2006), precludes this result. Dissent at 1156 (Madsen, J., dissenting). We disagree. Ondeo addressed the legislative intent to award attorney fees for actions against bonded contractors. See RCW 18.27.040. The court noted that "the common law rule in Washington is the American rule, which can be overcome by statute, contract, or recognized ground in equity." Ondeo, 159 Wash.2d at 303, 149 P.3d 666. Ondeo addressed statutory authority, which has little bearing on equity. Ondeo analyzed a statute governing a situation factually distinguishable from that which is before us. The statute does not preclude an award of fees in this case and, furthermore, Ondeo did not address questions of equity and thus offers no guidance to our present inquiry. We ground our decision to award attorney fees on equitable concerns; our analysis of RCW 18.27.040 does not affect our decision.

The dissent also argues the subcontract itself limits liability to the amount of the bond, but we read the subcontract differently. The provision, which does not assume the existence of a bond, states that the contractor shall be entitled to attorney fees "in connection with any matter or dispute arising under the Subcontract." CP at 608. No monetary limit is imposed on these fees. The only limiting mechanism is found in the bond, which states that "in no event shall the aggregate liability of the Surety exceed the amount of this bond." CP at 82. "Aggregate liability," however, is defined in the context of the bond as the cost of remedying the principal's default minus the subcontract price. Id. Attorney fees result from the surety's refusal to pay when obligated to; it is not a compensation for the principal's default and thus is not included in the equation that results in the "aggregate liability" discussed in the bond. Neither the subcontract nor the bond imposes any limit on the amount of attorney fees a court may award.
[1] Olympic S.S. Co. v. Centennial Ins. Co., 117 Wash.2d 37, 52, 811 P.2d 673 (1991).
[2] "`The American Rule on attorney fees is that attorney fees are not recoverable by the prevailing party as costs of litigation unless the recovery of such fees is permitted by contract, statute, or some recognized ground in equity.' McGreevy v. Or. Mut. Ins. Co., 128 Wash.2d 26, 35 n. 8, 904 P.2d 731 (1995)." City of Sequim v. Malkasian, 157 Wash.2d 251, 284, 138 P.3d 943 (2006).
[1] This case is difficult because Structures' decision to assist Action, while seemingly cooperative and sensible, is nevertheless inconsistent with its role of obligee under the performance bond.
[2] Structures never declared Action to be in default under the subcontract. Majority at 1133.
[3] If a declaration of default is not required and an obligee completes the work itself or hires a new subcontractor without consulting the surety, the surety is denied its right to control the cost of completion.
[4] "It may represent sound business practice for a surety to monitor its principal's work. Sureties however, frequently do not have either the expertise or the resources to actively monitor each project of every principal." 2 CUSHMAN & MYERS, supra, § 35.04[A], at 1279.
[5] "West explains that it did not contact Structures because it did not want to interfere with Structures' subcontract with Action." Majority at 1129.
[6] Olympic S.S. Co. v. Centennial Ins. Co., 117 Wash.2d 37, 811 P.2d 673 (1991).
[1] The majority confusingly holds that "by the plain terms of the bond the obligee was not required to formally declare the principal in default and that, regardless, adequate notice of default was given to the surety." Majority at 1130. The majority does not explain what constitutes "adequate" notice, or why notice is even relevant if the bond does not require it. The majority's mixed message on the issue of notice leaves a central issue of the case unresolved.
[2] In contrast, another widely used performance bond, form A312, specifically requires written notice at the surety's address, as set forth in the bond contract, at least 20 days in advance of a declaration of default, and defines default as "[f]ailure of the Contractor, which has neither been remedied nor waived, to perform or otherwise to comply with the terms of the Construction Contract." Am. Bar Ass'n, Bond Default Manual 185, 187 (Ex. 5.4, ¶ 12.3) (1987).
[3] "Section 19. Attorney's Fees.

In the event either party institutes suit in Court . . . against the other party, or against the surety of such party, in connection with any dispute or matter arising under the Subcontract, the Contractor shall be entitled to recover reasonable attorney's fees, expert witness fees and expenses, and costs relating to such suit." CP at 608 (emphasis added).
[4] A surety may waive these statutory rights by contractual agreement. See Amick, 66 Wash.2d at 305, 402 P.2d 342.
[5] RCW 19.72.900 provides: "This chapter applies to all sureties, regardless of whether the sureties are compensated or uncompensated." RCW 48.28.050 provides: "A surety insurer may be released from its liability on the same terms and conditions as are provided by law for the release of individuals as sureties."